**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | Civil Action No. 1:16-cv-00825-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Savannah River Nuclear Solutions, LLC | ) | |
| and Fluor Federal Services, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The Government filed a complaint against two government contractors, Defendants Savannah River Nuclear Solutions, LLC ("SRNS") and Fluor Federal Services, Inc. ("FFS"), raising six claims for relief, including three counts pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and three counts asserting common-law liability. (ECF No. 1.) Before the court is Defendants' motion to dismiss the Government's complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6). (ECF No. 21.) For the reasons that follow, the court **GRANTS** Defendants' motion to dismiss **IN PART** and **DENIES** it **IN PART**.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Factual Background

In March 2007, the U.S. Department of Energy ("DOE") issued a request for proposals ("RFP") to prospective offerors for award of a management and operations contract ("M&O contract") at the Savannah River Site, a DOE facility that processes and stores nuclear materials and is dedicated to environmental management and cleanup of the facility. (ECF No. 21-3 at 2-3.)

_____

[1] In setting forth the factual and procedural background, the court considers the complaint and only those additional documents that the court has determined are properly considered at this stage of the proceedings. (*See* Part II, *infra*.)

Under clause H-20, titled "Home Office Expenses," the RFP provided that "[h]ome office [('HO')] expenses, whether direct or indirect, relating to the activities of the Contractor are unallowable, except as otherwise specifically provided in the Contract or specifically agreed to in writing by the [contracting officer ('CO')] consistent with [Department of Energy Acquisition Regulation (the 'DEAR')] 970.3102-3-70, 'Home Office Expenses.'" (ECF No. 21-3 at 63; *see id.* at 4 (executive summary of the RFP).)  Under clause I.51(j), titled "Determining allowable costs," the RFP also provided that the CO "shall determine allowable costs in accordance with the Federal Acquisition Regulation [(the 'FAR')] subpart 31.2 and the [DEAR] subpart 48 CFR 970.31." (ECF No. 21-4 at 26.) The subpart cited by the RFP states that "Independent Research and Development Bid and Proposal [('B&P')] costs are unallowable." 48 C.F.R. § 970.3102-05-18; (*see* ECF No. 1 at 8 (citing subpart and analogous clause in M&O contract).)

The M&O contract was awarded to SRNS, which signed the contract on June 16, 2008, and commenced performance on August 1, 2008. (ECF No. 1 at 3, 6; ECF No. 21-2 at 7; ECF No. 21-5 at 2, 4-5.) The M&O contract is a cost-reimbursement contract, which means that SRNS would be reimbursed for actual costs it incurred in furtherance of performing work under the contract—so long as those costs are allowable—and would earn a fee that represents its profits. (ECF No. 1 at 6.) To receive its reimbursement for allowable costs, SRNS would "collect[] and consolidate[] invoices associated with its contract work scope" and draw daily upon a letter of credit to pay for those invoices. (*Id.* at 6-7.) From August 1, 2008, to December 31, 2015, using this method of reimbursement, "SRNS claimed and received more than $8 billion from [the] DOE under the M&O contract in reimbursement for its incurred costs." (*Id.* at 7.)

The M&O contract contained both clauses H-20, the clause regarding HO expenses, and I.51(j), the clause incorporating regulations regarding B&P costs, which were included in the RFP.

(ECF No. 21-5 at 62; ECF No. 21-6 at 73.) Although not specifically mentioned in the RFP or in

the M&O contract, the Government alleges, and Defendants agree, that "SRNS was authorized to

enter into loaned employee agreements with its owners and their affiliates," such as FFS, under a

practice known as "corporate reachback."[2]  (ECF No. 1 at 9.) As the complaint states,

> [t]he purpose of the loaned employee agreements is to allow for "reachback"
> to the SRNS member companies' employee pool for critical skills needed in
> the performance of the M&O contract at the Savannah River Site. The practice
> of using loaned employees has come to be known as "corporate reachback."

---

[2] It is not clear from the complaint, whether SRNS's authority to engage in corporate reachback is alleged to have arisen from the RFP, the M&O contract, or some other source. In their motion to dismiss, Defendants assert that the reachback program arose from SRNS's proposal in response to the RFP. Specifically, Defendants assert that SRNS's proposal in response to the RFP "offered a detailed description of FFS's expenses, which included 'all indirect costs'" and that the "DOE, consistent with the terms of Clause H-20 in the RFP, approved these expenses without exception and awarded SRNS the contract." (ECF No. 21-1 at 11; *see id.* at 12 ("The initial staffing of SRNS included reachback personnel from the SRNS member companies, which was explicitly described to [the] DOE in the contract proposal.").) The proposal has not been placed in the record, and the complaint makes no mention of it. Rather, in support of their assertions, Defendants cite their response to a DOE Office of Inspector General ("OIG") audit report. (*See id.* at 11-12 (citing ECF No. 21-2 at 18-19).) However, the court has determined that, at the motion to dismiss stage, Defendants may not rely on their response to the OIG report for these factual assertions. (*See infra* note 7.)

Only one other document that this court considers contains a relevant description of the proposal. An April 20, 2011 internal audit report states that, "[i]n June 2007, SRNS submitted a proposal . . . . In its Human Capital Solutions approach to retention, the SRNS proposal stated that should the availability of *critical skills* become an issue, SRNS would fill any short-term gaps by drawing from qualified personnel from their member companies." (ECF No. 21-8 at 11; *see also* ECF No. 21-9 at 10.) The court is mindful of the limitations on its consideration of documents attached to a motion to dismiss and of the facts that the internal audit report was commissioned by SRNS (*see* ECF No. 21-8 at 2) and has been disagreed with by Defendants (*see id.* at 29; ECF No. 21-1 at 13). Accordingly, the court concludes that any characterization of the contents of SRNS's proposal in this regard beyond what the complaint alleges would amount to impermissible weighing of the evidence. *See Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1245 n.2 (11th Cir. 2016) (noting, in similar context, that a contrary rule "would essentially allow the introduction of hearsay at the motion-to-dismiss stage, because it would force courts to accept secondhand descriptions of documents without any way of assessing the validity of those descriptions"). As far as the court is concerned, for purposes of the instant motion, at most, SRNS's proposal in response to the RFP included some sort of reachback program, which the DOE authorized. The court cannot assume that the proposal included a detailed description of FFS's costs or that the DOE accepted such a description.

> Corporate reachback consists of an intra-company human resources cost transfer and is not a subcontract with an outside source. As an acceptable and approved human resources technique, personnel are loaned pursuant to a cost transfer agreement and not a procurement (sub) contract.

(*Id.*)

SRNS and FFS entered a cost transfer agreement ("CTA") on December 22, 2008, which governed the corporate reachback program as between SRNS and FFS and specifically established procedures "for invoicing of costs incurred for [FFS] to provide personnel support" and for FFS "home office personnel who perform SRNS work" and "for processing and paying FFS invoices." (ECF No. 21-7 at 2.) In a clause titled "Reimbursement for Labor Costs," the CTA provided that "SRNS shall reimburse FFS for actual direct labor costs and associated indirect burdens," including "[o]verhead charges." (*Id.* at 3-4.) The CTA further provided, in a clause titled "Reimbursement for Expenses of Home Officer Personnel," that "allocations of home office expenses to FFS Loaned Employee costs are unallowable in accordance with the provisions of the [M&O c]ontract." (*Id.* at 5.) The same clause provided that, "[n]otwithstanding the above, SRNS will reimburse FFS for the costs of FFS personnel who are not Loaned Employees . . . who perform work in support of SRNS." (*Id.*)

In May 2010, SRNS's president, who was also a reachback employee of FFS, wrote a letter to the DOE, notifying it that SRNS and FFS were processing corporate reachback employee costs in accordance with the CTA. (ECF No. 1 at 10.) The Government alleges that Defendants "knew this statement was false" and "were knowingly charging both [HO] expenses and [B&P] costs to the DOE in direct violation of the [CTA] and . . . the M&O contract." (*Id.*)

On April 20, 2011, SRNS managers, some of whom were FFS reachback employees, received an internal audit report regarding the reachback program and the reimbursement for FFS employees performing work for SRNS under the CTA. (*Id.* at 11; ECF No. 21-8 at 7.) The report

concluded that the portion of the CTA providing that SRNS would reimburse FFS for FFS personnel who are not loaned employees and who perform work in support of SRNS was inconsistent with clause H-20 of the M&O contract. (ECF No. 21-8 at 28.)[3] In a response, which is incorporated into the report, SRNS management did not concur with the report's conclusion, asserting instead that the allocability and allowability of HO expenses are governed by the Cost Accounting Standards (the "CAS") found in the FAR, 48 C.F.R. ch. 99, subch. B, pt. 9904. (*Id.* at 29.) Under the CAS, SRNS management continued, "these questioned costs for Corporate Support are not an allocation of [HO] Expense, but are directly allocable and allowable costs that support work processes required by [the M&O c]ontracts but are performed in a location other than the Savannah River Site. Therefore, these costs questioned are allowable." (*Id.* at 29.) In short, SRNS management stated that they "fundamentally disagree[d] that these costs should be categorized as [HO] Expense. (*Id.* at 30.)

On May 20, 2011, an SRNS officer, Greg Ahlstrom, contacted the DOE, informing it that no FFS HO expenses were being billed to the DOE, but "insist[ing] that [FFS] did not believe that [FFS] loaned employee expenses met the definition of [HO] expenses prohibited by the M&O contract." (ECF No. 1 at 12.) The Government alleges that Ahlstrom's communication was

---

[3] In its complaint, the Government alleges that the internal audit report "explicitly considered the reimbursement of [FFS] employees in connection with the M&O contract, noted the [CTA,] and noted that the [CTA] established the procedure to be used by [FFS] for invoicing costs incurred relating to corporate reachback employees, as well as the procedure to be used by SRNS for processing and paying those invoices." (ECF No. 1 at 11.) The Government further alleges that Defendants never "challenged the [report]'s reference to the [CTA] or the accuracy of the [CTA]'s prohibition on claiming [HO] expenses for loaned employees." (*Id.*) The court assumes these allegations to be true but notes that only one comment (labeled comment F) of the 23 comments (labeled A through W) contained in the 93-page report suggests that the CTA conflicted with clause H-20 of the M&O contract. (*See* ECF No. 21-8 at 4-6, 27-30.) That comment specifically stated that the auditors believed that the CTA's treatment of non-loaned employees was inconsistent with clause H-20; it made no mention of the CTA's treatment of loaned employees. (*See id.* at 27-30.)

"false[]" and that he "did not inform [the] DOE that this interpretation was in direct contradiction to the [CTA] . . . and was in direct contradiction to the findings of, and management response to, the . . . internal audit [report]." (*Id.*) Following Ahlstrom's communication, the DOE initiated its own audit to determine whether any costs charged pursuant to the reachback program were unallowable. (*Id.*)

On January 31, 2012, SRNS and FFS modified the CTA by replacing the language stating that "allocations of [HO] expenses to FFS Loaned Employee costs are unallowable" to language stating that "allocations of [HO] expenses to *the SRNS segment* costs are unallowable." (*Id.* at 13 (internal quotation marks omitted).) The Government alleges that this modification was done "secretly" and that Defendants "knew that this change was directly at odds with the original meaning and intent of the [CTA] and . . . with the explicit contractual and regulatory provisions pertaining to [HO] expenses billed to [the] DOE." (*Id.*)

On May 21, 2012, SRNS forwarded to the DOE an internal audit that "review[ed] . . . expenses and burdens applied to the corporate reachback employee[s] working at SRNS." (*Id.* (internal quotation marks omitted).) The Government alleges that this communication was "the first time [the DOE] had actual evidence that [HO] expenses were being included in incurred costs submissions and billings to [the] DOE." (*Id.* at 14.)

Between July and October 2012, an auditing firm brought in by the DOE's Office of Inspector General ("OIG") conducted an "audit of [HO] expenses submitted by FFS." (ECF No. 21-2 at 7.) The OIG report, issued October 10, 2012, concluded that "[SRNS]'s costs incurred for [the M&O contract], for the period August 1, 2008 through August 21, 2012, included [HO] expenses of $1,256,481 . . . resulting from its use of [FFS] loaned employees." (*Id.* at 8, 22.) In January 2013, following the issuance of the OIG report, the DOE CO "issued a finding that all

home expenses . . . billed to [the] DOE through the corporate reachback program . . . were unallowable." (ECF No. 1 at 14.) In April 2015, the DOE sent SRNS a cease-and-desist letter, demanding that SRNS discontinue its billing of HO expenses to the DOE under the M&O contract. (*Id.*)

On March 14, 2016, the Government filed a complaint against Defendants in this court, alleging the factual background outlined in the above paragraphs, as supplemented by the documents the court properly considers at this stage of litigation. (*See* ECF No. 1 at 3, 5-14; Part II, *infra*.) The complaint includes three counts of FCA violations against both Defendants, one count of breach of contract against SRNS, one count of unjust enrichment against FFS, and one count of payment by mistake against both Defendants. (*Id.* at 21-24.)

**B. Alleged false and fraudulent claims**

In its complaint, the Government alleges that Defendants made three types of false and/or fraudulent claims. First, the Government alleges that "[b]etween October 2008 and December 31, 2015, [FFS] submitted invoices to SRNS and caused those invoices to be claimed to the DOE under the M&O contract for explicitly unallowable [B&P] costs." (*Id.* at 14.) For each invoice, the Government alleges that FFS "knowingly and falsely certified that the costs included in the invoice were in accordance with the requirements of the M&O contract and therefore did not contain explicitly unallowable [HO] and [B&P] costs." (*Id.*; *see id.* (reiterating that "[FFS] knew that these certifications were false and also knowingly caused the submission of false and fraudulent claims by SRNS to [the] DOE").) Although this type of fraudulent claim focuses on FFS's culpability for submitting invoices to SRNS, the Government's complaint alleges that "[FFS] and SRNS have knowingly and fraudulently claimed more than $5,203,000 in contractually unallowable [HO] and [B&P] costs." (*Id.*)

Second, the Government alleges that SRNS knowingly submitted false annual certifications. Under the terms of the M&O contract, "SRNS was required to review its claimed costs annually, including its reachback costs, and certify that all costs were allowable, allocable, reasonable, and had properly been incurred in furtherance of SRNS's contract scope of work." (*Id.* at 15.) In each October of 2008, 2009, 2010, 2011, and 2012, an SRNS officer submitted to the DOE a signed statement, certifying that "the [c]osts [i]ncurred and [c]laimed are allowable and reasonable in accordance with the terms of the [M&O] contract and applicable laws and regulations." (*Id.* at 15-17.) The Government alleges that, for each certification, both SRNS and FFS "knew th[e] certification was false and knew that [they] submitted and caused to be submitted false and fraudulent claims that contained unallowable [HO] and [B&P] costs." (*Id.*) In October 2013 and again in March 2015, an SRNS officer submitted to the DOE a signed statement, making the same certification as in previous years. (*Id.* at 18.) However, these last two certifications contained footnotes, in which the officer explained that SRNS had been notified of a "potential civil action with regard to the application of overheads on contract charges for [FFS] employees . . . , involv[ing] accounting mischarges and false certification of claimed costs regarding [HO] expenses, [B&P] expenses." (*Id.*) The Government lodges the same allegation regarding these last two certifications as it lodged regarding previous certifications: SRNS and FFS "knew th[e] certification was false and knew that [they] submitted and caused to be submitted false and fraudulent claims that contained unallowable [HO] and [B&P] costs." (*Id.* at 18-19.)

Third, the Government alleges that "[b]etween October 8, 2008, and December 31, 2015, [FFS] submitted 573 claims to SRNS in connection with its reachback employees that it knew contained unallowable [HO] and [B&P] costs in direct violation of DOE [r]egulations and the M&O contract" and that FFS and SRNS "knowingly colluded and submitted or caused to be submitted claims to the DOE under the M&O contract that included the fraudulent [HO] and [B&P] costs." (*Id.* at 19.) The

Government further alleges that "SRNS and [FFS] knowingly and fraudulently certified that [they] had not included any unallowable costs in [SRNS]'s [letter-of-credit] drawdowns." (*Id.*)

**C. Motion to Dismiss**

Defendants filed the instant motion to dismiss on May 20, 2016, arguing, pursuant to Rule 12(b)(6), that the three FCA counts, the unjust enrichment count, and the payment by mistake count fail to state a claim upon which relief could be granted and that, pursuant to Rule 12(b)(1), the court lacks subject-matter jurisdiction over the breach of contract count. (*See* ECF No. 21; ECF No. 21-1.) The issues raised by the motion have been fully briefed, and the court held a hearing on the motion on November 7, 2016.

## II. DOCUMENTS CONSIDERED

Before turning to the parties' arguments, the court preliminarily must determine what documents appropriately may be considered in its Rule 12(b)(6) assessment. Defendants have attached 11 exhibits to their motion to dismiss: (1) the OIG audit report (ECF No. 21-2), (2) the RFP for which SRNS was formed and for which it was awarded the M&O contract (ECF Nos. 21-3, 21-4), (3) the M&O contract (ECF Nos. 21-5, 21-6), (4) the December 22, 2008 CTA between SRNS and FFS (ECF No. 21-7), (5) the April 20, 2011 internal audit report completed by SRNS (ECF Nos. 21-8, 21-9), (6) email correspondence between the DOE CO and SRNS management discussing whether HO expenses would be disallowed (ECF No. 21-10), (7) a May 24, 2010 letter from SRNS's president to DOE officials summarizing SRNS's activities pursuant to the M&O contract's reachback provisions (ECF No. 21-11), (8) a complaint filed by SRNS against the DOE on May 19, 2016, in the Civilian Board of Contract Appeals ("CBCA") (ECF No. 41), (9) SRNS's response in opposition to the DOE's motion to dismiss the CBCA complaint[4] (ECF No. 41-1),

---

[4] The Government attached the DOE's motion to dismiss the CBCA complaint to its response to Defendant's motion to dismiss. (ECF No. 26-1.)

(10) the DOE's reply to SRNS's response (ECF No. 41-2), and (11) SRNS's sur-reply to the DOE's reply (ECF No. 41-3). In addition to these documentary exhibits, Defendants' motion to dismiss also frequently references portions of the FAR, specifically the CAS, which is found therein, and portions of the DEAR, 48 C.F.R. ch. 9. (*See* ECF No. 21-1 at 15-19, 22.)

Defendants contend that because many of their exhibits "are explicitly referenced throughout the Complaint and are integral to the Government's claims" or because they are either "in [the Government]'s possession" or within the Government's knowledge and the Government "clearly relied on [them] in forming the Complaint," "the [c]ourt may consider [them] for purposes of the instant motion without converting it into a motion for summary judgment." (ECF No. 21-1 at 10-14 nn.1-5, 27 n.10.) Defendants also note that the CAS are binding on the parties both by the terms of the M&O contract and by statute, that the M&O contract's HO expense provision referred to the DEAR, and that the Government relies on the DEAR regulations in its complaint. (*Id.* at 15 & n.6, 26 n.9, 27, 30.) In response, the Government states that it "has no objection to th[e] principle [that the court may refer to documents referenced in the complaint without converting the motion into one for summary judgment]—except where . . . Defendants use these exhibits to support bald and factually incorrect assertions, unconnected to any specific allegations in the Complaint." (ECF No. 26 at 18 n.5). The Government offers only one example of a document that fits into this vaguely-worded exception. Noting that its complaint references the OIG audit report, the Government argues that this does not mean that it would be proper for the court to consider Defendants' response to the OIG audit, which is contained in the report. (*Id.*; *see* ECF No. 21-2 at 14-20.)

Although courts "generally do not consider extrinsic evidence when evaluating the sufficiency of a complaint," in a motion under Rule 12(b)(6), there are exceptions: for example,

courts "may properly consider documents attached to a . . . motion to dismiss 'so long as they are integral to the complaint and authentic.'" *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). Thus the court may consider documents that are "integral to and explicitly relied on in the complaint" when the Government "do[es] not challenge [their] authenticity." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *accord Zak v. Chelsea Therapeutics Int'l, Inc.*, 780 F.3d 597, 606-07 (4th Cir. 2015); The Fourth Circuit has explained that

> "[t]he rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff— is dissipated where plaintiff has actual notice and has relied upon these documents in framing the complaint. What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent."

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal quotation marks, brackets, and ellipsis omitted) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)); *see also Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3rd Cir. 1993) ("[A] court may properly consider a concededly authentic document upon which the complaint is based when the defendant attaches such a document to its motion to dismiss . . . . Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document.").

The Fourth Circuit has not definitively set forth a standard for deciding when a document attached to a motion to dismiss should be considered "integral" to a complaint. *See Goines v. Valley Comty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). However, reviewing Second Circuit case law in the recent *Goines* opinion, the Fourth Circuit suggested that a relevant inquiry may include whether the complaint's "claims . . . turn on, []or are . . . otherwise based on, statements

contained in the [document]." *Id.* (citing *Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015) (document with "no independent legal significance to [plaintiff's] claim" was not integral to complaint); *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint."); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (explaining that a document is "integral to the complaint" "where the complaint relies heavily upon its terms and effect" (internal quotation marks omitted))). The *Goines* Court also indicated that it is relevant whether the plaintiff disputes that the document proffered by the moving defendant is integral to the complaint. *Cf. id.* ("[B]ecause [plaintiff] does not argue otherwise, we will assume without deciding that the [document] was integral to the complaint.").

In numerous cases, the U.S. District Court for the District of Maryland has adopted what appears to be a higher standard than that suggested in *Goines*: "To be 'integral,' a document must be one 'that by its very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Royster v. Gahler*, 154 F. Supp. 3d 206, 227 (D. Md. 2015) (quoting *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)). Other courts within the Fourth Circuit, including this court, have employed this standard prior to the Fourth Circuit's recent opinion in *Goines*. *See Tinsley v. OneWest Bank, FSB*, 4 F. Supp. 3d 805, 819 (S.D.W. Va. 2014); *Tisdale v. Enter. Leasing Co.-Se., LLC*, No. 3:13cv221-MU, 2013 WL 3227927, at *2 n.2 (W.D.N.C. June 25, 2013); *Mozingo v. Orkin, Inc.*, No. 4:10-cv-71, 2011 WL 845896, at *4 (E.D.N.C. March 8, 2011); *Alexander v. City of Greensboro*, 762 F. Supp. 2d 764, 822 (M.D.N.C. 2011); *Hendrix Ins. Agency, Inc. v. Continental Cas. Co.*, No. 7:10-2141-HMH, 2010 WL 4608769, at *4 (D.S.C. Nov. 3, 2010); *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007).

In the instant motion, Defendants argue that the M&O contract (ECF Nos. 21-5, 21-6), the CTA (ECF No. 21-7), the internal audit report (ECF Nos. 21-8, 21-9), the email correspondence regarding HO expense disallowance (ECF No. 21-10), and the letter regarding the reachback program (ECF No. 21-11) fall under this exception and thus may be considered in resolving the Rule 12(b)(6) motion. (ECF No. 21-1 at 11-14 nn.2-5, 27 n.10.) Because the Government references these documents in its complaint and does not dispute the authenticity of any of them, the only issue is whether the documents are integral within the meaning of the exception. The court has no trouble concluding that the M&O contract is integral under the higher standard employed in the District of Maryland, as the M&O contract gives rise to the legal rights asserted by the Government against SRNS. Without the M&O contract, which allegedly binds SRNS, preventing it from charging HO expenses and B&P costs, the Government could not assert any of the six counts contained in the complaint against SRNS. The court likewise concludes that the CTA is integral, as it gives rise, in part, to the legal rights asserted by the Government against FFS. The complaint expressly relies on the fact that FFS was bound by the CTA so that FFS could not charge HO expenses and B&P costs to the DOE (*see* ECF No. 1 at 9-11), and the invalidity of the charges underlies all six counts in the Government's complaint.

The M&O contract directly references each of the DEAR provisions cited in Defendants' motion to dismiss (*compare* ECF No. 21-5 at 62, 77, 80, *with* ECF No. 21-1 at 11, 26 n.9, 27), and it incorporates by reference "with the same force and effect as if they were given in full text" (ECF No. 21-5 at 88, 90) the requirement that the contractor "[c]omply with all CAS" as set forth "in 48 CFR part 9904," 48 C.F.R. § 52.230-2. Because the M&O contract incorporates or refers to the CAS and DEAR provisions that Defendants cite in their motion to dismiss, the court will consider these provisions under the exception.

Whether the internal audit report (ECF Nos. 21-8, 21-9) is integral is a little more difficult to decide. The Government's complaint refers to the internal audit report to support its allegation that Defendants were aware that the CTA governed the invoicing of FFS's costs relating to reachback employees, because the internal audit report stated as much (*see* ECF No. 1 at 11-12), and its allegation that Defendants did not inform the DOE that their interpretation of the M&O contract's HO provision was at odds with the internal audit report (*see id.* at 12), which inferentially supports the allegation that Defendants knew their claims were false or fraudulent.[5] Arguably, the report would be integral under the District of Maryland standard, as the existence of the report and Defendants' alleged nondisclosure of it and their disagreement with its conclusions give rise to the requisite scienter element of the complaint's FCA counts. It is more likely to be integral under the standard suggested by *Goines* because the Government's FCA claims turn, or are based, in part on Defendants' failure to disclose statements contained in the report. The court notes that considering the report at this stage accords with the reason for the exception. The Government had ample notice of the report's existence prior to filing the complaint and has framed portions of it complaint in reliance on the report's existence as well as its contents. *See Trigon*, 367 F.3d at 234. Further, consideration of the report would prevent the Government from advancing fraud claims by relying on only selected portions of a document it chose not to attach to its complaint. *Id.* Accordingly, the court concludes that it is proper to consider the internal audit report in resolving the 12(b)(6) motion.

---

[5] The complaint also alleges that Defendants did not disclose the internal audit report to the DOE until May 22, 2011, and that this disclosure constituted "the first time the [DOE] had actual evidence that [HO] expenses were being included in . . . billings to the DOE." (ECF No. 1 at 13-14.) Standing alone, this reference to the internal audit report would not permit a finding that the report was integral to the complaint, as "at most" the complaint alleges that the report "provided plaintiffs with some notice of a possible right of action." *Walker*, 517 F. Supp. 2d at 806.

The court concludes, however, that the email correspondence (ECF No. 21-10) and the May 24, 2010 letter (ECF No. 21-11) will not be considered under the exception. As Defendants note (ECF No. 21-1 at 8 n.5), the complaint does not reference the entire email chain they attach as an exhibit, but instead references a single January 29, 2013 email in which the DOE CO notified Defendants of his decision that the HO expenses were disallowed. (*Compare* ECF No. 1 at 14, *with* ECF No. 21-10.) Defendants would like the rest of the email chain considered as it shows that, after January 29, 2013, they continued claiming the disputed costs under a claim of right because the contracting officer refused to render a final decision. (*See* ECF No. 1 at 13-15 (citing 41 C.F.R. § 7103(a)(3); 48 C.F.R. § 32.605(a)(1)).) However, because, as discussed more thoroughly below, the complaint's allegations make clear that all of Defendants claims for the disputed costs on and after May 20, 2011, were made under a claim of right, it is unnecessary to consider the remainder of the email chain. Similarly, Defendants request that the May 24, 2010 letter be considered only in their efforts to show that the disputed costs were allowable under the M&O contract (*see* ECF No. 21-1 at 25-28), but, because the court declines to determine at this stage whether or not the costs were allowable, the letter will not be considered.  Accordingly, the court does not need to consider these documents beyond the factual allegations regarding them in the complaint, which the court must assume to be true. *See Anand*, 754 F.3d 195 (noting that court's "*may* properly consider documents attached to a . . . motion to dismiss" (emphasis added)).

The court concludes that the RFP (ECF Nos. 21-3, 21-4) does not fall under the exception. Contrary to Defendants' assertion (*see* ECF No. 21-1 at 11 n.2), the Government's complaint never references, even obliquely, the RFP. Moreover the claims in the complaint do not turn, and are not based on, statements contained within the RFP.  However, the court may take judicial notice of the RFP, pursuant to Fed. R. Evid. 201, because it is a matter of public record. *See Papasan v.*

*Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under [Rule 12(b)(6)], we are not precluded in our review of the complaint from taking notice of items in the public record . . . ."); *id.* (suggesting consideration of items in the public record is more appropriate when it is "not disputed by the parties"); *United States v. Zayyad*, 741 F.3d 452, 463-64 (4th Cir. 2014) (explaining that courts may take judicial notice of "indisputable facts," such as "when they are 'generally known within the trial court's territorial jurisdiction" or they "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned'" (quoting Fed. R. Evid. 201(b))); *Haw. Coal. for Health v. Hawaii*, 576 F. Supp. 2d 1114, 1119 n.3 (D. Haw. 2008) (taking judicial notice of an RFP because it is "a matter of public record" (internal quotation marks omitted)). Likewise, the court may take judicial notice of the OIG report (ECF No. 21-2) pursuant to Rule 201 because it is a matter of public record, available at the DOE's website.[6] The court may also take judicial notice of the filings in the CBCA (ECF Nos. 26-1, 41, 41-1, 41-2, 41-3), although not the content therein, under the same rule. *See Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 n.* (4th Cir. 2004); *Colonial Penn Inc. Co. v. Coil*, 887 F.2d 1236, 1239-40 (4th Cir. 1989). Accordingly, the court will consider the RFP, the OIG report, and the CBCA filings.[7]

---

[6] *See* http://energy.gov/ig/downloads/audit-report-oas-l-13-08 (last accessed Dec. 6, 2016).

[7] The court is mindful of the Fourth Circuit's admonition that "judicial notice must not 'be used as an expedient for courts to consider matters beyond the pleadings and thereby upset the procedural rights of litigants to present evidence on disputed matters.'" *Goldfarb v. Mayor & City Council*, 791 F.3d 500, 511 (quoting *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 360 (4th Cir. 2013). Thus, "when a court considers relevant facts from the public record at the pleading stage, the court must construe such facts in the light most favorable to the plaintiffs. Moreover, the determination whether a fact properly is considered under this exception depends on the manner in which a court uses this information." *Zak*, 780 F.3d at 607 (internal citation omitted). If a court decides to take judicial notice of documents in the public record, it must be careful to limit that judicial notice so as to not take judicial notice of a party's interpretation of those documents. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009); *see also Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 558 (4th Cir.

In sum, the court's decision takes into consideration the OIG audit report, the RFP, the M&O contract, the CTA, the internal audit report, and the CBCA filings. The court does not consider the email correspondence or the letter Defendants attached as exhibits to their motion to dismiss beyond the factual allegations regarding them in the complaint.

## III. STANDARDS OF REVIEW

### A. Rule 12(b)(6) standard

Defendants move to dismiss five counts of the complaint pursuant to Rule 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

---

2013) ("[W]hether information is the proper subject of judicial notice depends on the use to which it is put."), *abrogated on other grounds by Reed v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015), *as recognized in Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015).

The Government complains that, in their motion to dismiss, Defendants rely on the part of the OIG report containing their response to the audit as containing facts for the court to consider. (*See* ECF No. 28 at 18 n.5 (citing ECF No. 21-1 at 11).) The court agrees with the Government's view and therefore will not consider as fact for purpose of deciding the 12(b)(6) motion Defendants' assertion that "SRNS's proposal in response to the RFP offered a detailed description of FFS's expenses, which included "'all indirect costs, including labor overhead, G&A and Cost of Money (COM).'" (ECF No. 21-1 at 11 (quoting ECF No. 21-2 at 18-19).) When considering the portions of the OIG report containing Defendants' response to the audit, the court will not consider Defendants' substantive arguments in the response as "fact," but will consider the fact that Defendants advanced those substantive arguments at the time.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a complainant's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555–56 (citations omitted). When considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the complainant. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

"In addition, claims under the FCA 'must also meet the more stringent particularity requirement of Federal Rule of Civil Procedure 9(b).'" *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 634 (4th Cir. 2015) (quoting *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014)), *vacated on other grounds*, 136 S. Ct. 2504 (2016); *see also United States ex rel. v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013) ("We have adhered firmly to the strictures of Rule 9(b) in applying its terms to cases brought under the [FCA]."). "Rule 9(b) requires that 'an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Triple Canopy*, 775 F.3d at 634 (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). "More precisely, the complaint must allege 'the who, what, when, where and how of the alleged fraud.'" *Ahumada*, 756 F.3d at 280 (quoting *Wilson*, 525 F.3d at 379). "Requiring such particularized pleading . . . 'prevents frivolous suits, eliminates fraud actions in which all the facts are learned after discovery, and protects defendants from harm to their goodwill and reputation.'" *Id.* at 280-81 (brackets and ellipses omitted) (quoting *Takeda*, 707 F.3d at 456).

**B. Rule 12(b)(1) standard**

Defendants move to dismiss one count of the complaint pursuant to Rule 12(b)(1). A motion to dismiss for lack of subject matter jurisdiction raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999). "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* In a motion to dismiss pursuant to Rule 12(b)(1), "[t]he burden of establishing subject matter jurisdiction rests with the plaintiff." *Demetres v. E.W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).

## IV. ANALYSIS

**A. FCA claims**

The Government alleges three counts of FCA violations. In the first two counts, the Government alleges that Defendants submitted false claims for payment or approval under the M&O contract in violation of FCA provisions now codified at 31 U.S.C. § 3729(a)(1)(A).[8] (*See*

---

[8] The first count applies to the submission of false claims through May 19, 2009, and, in it, the Government alleges Defendants submitted "to an officer or employee of the United States false or fraudulent claims for payment or approval for activities under the M&O contract" in violation of 31 U.S.C. § 3729(a)(1). (ECF No. 21.) The second count applies to the submission of false claims on or after May 20, 2009, and, in it, the Government alleges Defendants submitted "false or fraudulent claims for activities under the M&O contract" in violation of 31 U.S.C. § 3729(a)(1)(A) (*Id.*)

ECF No. 1 at 21-22.) The claims were false or fraudulent, the Government alleges, because "Defendants knowingly conceal[ed] [HO] and [B&P] costs that resulted in false and inflated Contract prices." (*Id.* at 21). In the third count, the Government alleges that Defendants "knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment under the M&O contract" in violation of FCA provisions now

---

On May 20, 2009, amendments to the FCA in the Fraud Recovery and Enforcement Act ("FERA") of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009), took effect. The FERA amendments replaced former § 3729(a)(1)-(2) with new § 3729(a)(1)(A)-(B). For FCA claims not covered by the FERA amendments, "the FCA imposed civil liability on any person who . . . 'knowingly presents, or causes to be presented to an officer or employee of the United States Government a false or fraudulent claim for payment or approval.'" *United States ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 82 (1st Cir. 2012) (internal citations and ellipsis omitted) (citing prior version of 31 U.S.C. § 3729(a)(1)). For claims covered by the FERA amendments, "an individual incurs liability when he or she 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.'" *Id.* at 82 n.17 (citing current version of 31 U.S.C. § 3729(a)(1)(A)). FERA amended the FCA to define "claim" as "any request or demand that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor . . . or other recipient, if the money or property is to be spent or used . . . to advance a Government program or interest, and if the United States Government . . . provides or has provided" or "will reimburse such contractor . . . or other recipient" "any portion of the money or property requested or demanded." Sec. 4(a)(2), 123 Stat. at 1622-23 (codified as amended at 31 U.S.C. § 3729(b)(2)).

The Government's complaint appears to treat claims regarding conduct that occurred before FERA became effective differently than claims regarding conduct that occurred after FERA became effective. Some courts have agreed with this approach, *see United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 369 n.2 (5th Cir. 2011); *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010), and it seems to better follow FERA's language, *see* Sec. 4(f), 123 Stat. at 1625 ("The amendments made by this section shall take effect on the date of enactment of this Act and *shall apply to conduct* on or after the date of enactment . . . ." (emphasis added)). However, other courts have concluded that claims filed pursuant to old § 3729(a)(1) or new § 3729(a)(1)(A) are controlled by the version of the FCA in effect at the time the complaint was filed, meaning, here, the current post-FERA version of the FCA. *See Jones*, 678 F.3d at 82 n.17 (citing *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 380 (1st Cir. 2011)); *cf. United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 n.4 (5th Cir. 2013). The court declines to decide the issue because it appears irrelevant which version of the FCA is employed at this stage as assessment of Defendants' arguments in support of dismissal would be the same under either version. In this regard, the court notes that the parties' briefs do not address the first two counts separately or make any mention of the changes in FCA jurisprudence occasioned by FERA. For convenience, the court will refer to the current version of the FCA.

codified at 31 U.S.C. § 3729(a)(1)(B)[9] (*Id.* at 22.) The records and statements to which the Government refers are Defendants' "certifi[cations] that SRNS's submitted incurred costs to the DOE met the requirements of the M&O contract and did not contain expressly unallowable costs," their "state[ments] that the processing and submission of costs for reachback labor was in accordance with the [CTA]," their "assert[ions] that they had understood the requirements of the M&O contract did not apply to [FFS]." (*Id.*) The Government alleges the certifications and statements, "were material to SRNS's ability to claim costs under the M&O contract and ultimately to Defendants' false or fraudulent claims for payment under the M&O contract." (*Id.*)

The FCA prohibits any person from knowingly presenting or causing to be presented a false or fraudulent claim for payment, or knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A)-(B). "To state a claim under the FCA, the plaintiff must prove: (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made

---

[9] The complaint states that the third count applies to the making or use of false records or statements after June 6, 2008, in violation of 31 U.S.C. § 3729(a)(1)(B). FERA replaced old § 3729(a)(2) with new § 3729(a)(1)(B), which eliminated the Supreme Court's requirement, in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), that a subcontractor who submitted a false statement to a prime contractor must intend that the statement be used "to get" the government to pay a claim. *See* 553 U.S. at 671-72; *United States ex rel. Wall v. Circle C Const., L.L.C.*, 697 F.3d 345, 355 n.3 (6th Cir. 2012) (citing *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 n.2 (6th Cir. 2011)); *Steury*, 625 F.3d at 267 n.1. Unlike its other provisions, FERA expressly stated that its amendment to the FCA creating § 3729(a)(1)(B) "shall take effect as if enacted on June 7, 2008, and apply to all *claims* under the [FCA] that are *pending* on or after that date." Sec. 4(f)(1), 123 Stat. at 1625 (emphasis added) (internal citation omitted). "[A] circuit split has arisen over whether 'claims . . . pending,' in this context, refers to underlying claims for *payment* from the government or the *legal* claims presented in the action itself," and the Fourth Circuit has declined to weigh in. *Ahumada*, 756 F.3d at 280 n.7 (citing *Sanders v. Allison Engine Co.,* 703 F.3d 930, 940 (6th Cir. 2012 (collecting cases)); *see also United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639-41 (7th Cir. 2016), *pet. for cert. filed*, 85 U.S.L.W. 3171.

Here, the court need not determine the meaning of FERA's reference to "claim." Under either view, all of the Government's claims in the third count would necessarily be "pending" on or after June 7, 2008, as SRNS signed the M&O contract on June 16, 2008, and began performance on August 1, 2008. Thus, the new § 3729(a)(1)(B) applies to the complaint's third count.

or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due." *United States ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison II*), 352 F.3d 908, 913 (4th Cir. 2003).

1. Bid and proposal costs

In their motion to dismiss, the only ground Defendants raise for dismissal of the Government's FCA claims that are based on Defendants' submission of B&P costs is that such claims fail to meet the particularity requirements of Rule 9(b). (*See* ECF No. 21-1 at 30.) Although it is a close call, the court concludes that the complaint's allegations are sufficient to meet the Rule 9(b) particularity requirement. The complaint begins by alleging that B&P costs are unallowable under the terms of the M&O contract and applicable regulation and that FFS's and SRNS's managerial personnel knew B&P costs are unallowable. (*Id.* at 9.) The complaint also alleges that, between October 8, 2008, and the end of 2015, FFS submitted invoices to SRNS including B&P costs; that FFS submitted certifications to SRNS stating that the invoices did not include B&P costs; that SRNS submitted claims to the DOE that included these B&P costs; and that specified officers, who were also FFS reachback employees, submitted annual certifications to the DOE stating that the claims did not include B&P costs. (*Id.* at 10, 14-15, 19). The complaint alleges that FFS and SRNS knowingly submitted the invoices and claims and knew that their certifications were false. (*Id.*). The complaint specifies the annual amount of B&P costs that were included in the claims to the DOE (*id.* at 15-19) and lists, in an attachment to the complaint, the amounts, invoice numbers, and dates of 573 separate invoices that FFS submitted to SRNS, which the Government alleges, included the unallowable B&P costs (*see id.* at 19-20; ECF No. 7.) The complaint also points to 290 payments, listed in a separate attachment with amounts, dates, and

reference numbers, of payments made to FFS by SRNS, which, the Government alleges, includes reimbursement for unallowable B&P costs. (*See* ECF No. 1 at 20; ECF No. 7-1.)

The court concludes that these allegations are sufficient for purposes of Rule 9(b). The allegations regarding FFS's and SRNS's knowledge are conclusory, but that is allowed under Rule 9(b). The complaint identifies who committed the fraud—FFS and SRNS management—and identifies specific individuals who worked for SRNS as FFS reachback employees and certified to the DOE that the costs were allowable under the M&O contract. It alleges what the fraud entailed and how it operated: invoices including undisclosed B&P costs were certified by FFS and submitted by FFS to SRNS which were then forwarded as claims to the DOE by SRNS, which were later certified by specific officers as in compliance with the M&O contract and resulted in the DOE's making improperly inflated payments to SRNS, which then forwarded such payments to FFS under the terms of the CTA. Further, as discussed below, the complaint also alleges the method by which Defendants covered up their activities—by means of secretly amending the CTA and advancing pretextual arguments regarding the allowability of costs—which, to some extent, may be applied to their claims for B&P costs.  The Government specifies the time period at issue (October 8, 2008, onward), the annual amounts of B&P costs at issue, some details regarding the numerous invoices from FFS to SRNS that include the alleged B&P costs, and some details regarding the numerous payments from SRNS to FFS in response to these invoices. These allegations are sufficient. *See, e.g.*, *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015).[10] Although more specification—such as identifying which SRNS and FFS officers decided

---

[10] There, the Fourth Circuit said:

> In sum, Smith's complaint identified who committed fraud-Defendants; alleged that the Davis–Bacon Act applied to the pertinent contracts; contended that Defendants paid Smith and others less than the Davis–Bacon Act required, specifically identifying Smith's pay and comparing it to the applicable Davis–

that B&P costs would be invoiced and charged or what portions of each invoice and payment were B&P costs—would be helpful in ensuring safe passage through Rule 9(b)'s murky waters, the court concludes that they are not necessary here.

### 2. Home office expenses

As discussed below, much of Defendants' motion to dismiss regarding the complaint's FCA claims as to HO expenses centers on certain requirements the Government bears in pleading an FCA claim, namely the requirements of sufficiently pleading falsity, scienter, and materiality. Interspersed in this portion of Defendants' motion are arguments relating to the *Twombly-Iqbal* plausibility standard and Rule 9(b)'s particularity standard. Rather than mash these concepts together, the court chooses to treat them separately. Thus the court begins by discussing the falsity, scienter, and materiality requirements before turning to the pleading standards.

Courts consistently have cautioned that plaintiffs may not "'shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the [FCA].'" *Owens*, 612 F.3d at 728 (quoting *Wilson*, 525 F.3d at 373). Indeed, courts recognize that "the FCA is a [limited-purpose] fraud prevention statute.'" *Id.* (brackets omitted) (quoting *United State ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999)); *see Universal Health Servs., Inc. v. United States*, ___ U.S. ___, 136 S. Ct. 1989, 2003 (2016) ("The False Claims Act is not 'an all-purpose antifraud statute.'" (quoting *Allison Engine*, 553 U.S. at 672)). It is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health*, 136 S. Ct. at 2003; *see also Steury*, 625 F.3d at 268 ("The FCA is not a general 'enforcement device' for

---

Bacon Act pay scales; and alleged that Defendants falsely certified their compliance with the Davis–Bacon Act to the Government, which caused the Government to make improperly inflated payments to Defendants. These allegations pass Rule 9(b) muster.

796 F.3d at 433 (citing *Harrison II*, 352 F.3d 908).

federal statutes, regulations, and contracts."); *Wilson*, 525 F.3d at 378 ("While the phrase 'false or fraudulent claim' in the [FCA] should be construed broadly, it just as surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood." (internal citation and quotation marks omitted)). "Allowing [the FCA] to be used in run-of-the-mill contract disagreements . . . would burden, not help, the contracting process, thereby driving up costs for the government and, by extension, the American public." *Owens*, 612 F.3d at 726. Simply put, because of the FCA's limited purpose, "the normal run of contractual disputes are not cognizable under the [FCA]." *Wilson*, 525 F.3d at 383.

Courts have also observed that, in some circumstances, FCA theories of liability are "prone to abuse by the government and *qui tam* relators who, seeking to take advantage of the FCA's generous remedial scheme, may attempt to turn the violation of minor contractual provisions into an FCA action." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1270 (D.C. Cir. 2010). In order to "maintain a 'crucial distinction' between punitive FCA liability and ordinary breaches of contract" and regulatory violation, *Steury*, 625 F.3d 268, courts have strictly enforced the falsity, scienter, and materiality requirements as discussed in the following pages, *see Sci. Applications*, 626 F.3d at 1270 (noting "this very real concern can be effectively addressed through strict enforcement of the [FCA]'s materiality and scienter requirements"); *accord United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 388 (1st Cir. 2011); *see also Wilson*, 525 F.3d 377-78 (enforcing falsity requirement on ground that "to [do] otherwise would render meaningless the fundamental distinction between actions for fraud and breach of contract"). As the Supreme Court recently has emphasized, "[these] requirements are rigorous," and courts should enforce them, if possible, at the motion-to-dismiss stage. *Universal Health*, 136 S. Ct. at 2002, 2004 n.6.

*a. Falsity*

Defendants raise three related arguments in support of their contention that the Government's complaint does sufficiently plead the falsity required for FCA claims. Specifically, Defendants argue that the complaint fails to sufficiently plead (a) that Defendants' claims for HO expenses were false, (b) that FFS's loaned employee costs are unallowable, and (c) that there existed a fraudulent scheme. (ECF No. 21-1 at 21-30.) Rather than follow Defendants' outline, the court will hew its own path based on Defendants' arguments.

A fundamental requirement of the FCA, regardless of the section allegedly violated, is that the false or fraudulent claims or statements at issue must be objectively false. *See Wilson*, 525 F.3d at 376-77; *see also United States ex rel. Yannacopoulos v. Gen. Dynamics,* 652 F.3d 818, 836 (7th Cir. 2011) ("A statement may be deemed 'false' for the purposes of the [FCA] only if the statement represents an objective falsehood." (internal quotation marks omitted)). An FCA claim premised on a defendant's expression of opinion will not do because "fraud may only be found in expressions of fact which '(1) admit of being adjudged true or false in a way that (2) admit of empirical verification.'" *Harrison v. Westinghouse Savannah River Co.* (*Harrison I*), 176 F.3d 776, 792 (4th Cir. 1999) (brackets omitted) (quoting *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986)). "Likewise, 'imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA.'" *Wilson*, 525 F.3d at 377 (quoting *Lamers*, 168 F.3d at 1018); *accord Yannacopoulos*, 652 F.3d at 836.

Defendants argue that the Government has failed to plausibly allege that any of Defendants' claims for costs based on corporate reachback were objectively false. In large part, this argument is aimed at establishing, through in-depth analysis of the M&O contract, the CAS,

and the DEAR, that clause H-20, the HO expense provision of the M&O contract, does not make unallowable the costs that the Government alleges Defendants fraudulently submitted for reimbursement. If Defendants are correct that the claims for FFS loaned employee corporate reachback costs they submitted were allowable under the M&O contract and regulation, then the Government cannot prevail on any of its FCA claims that are based on Defendants' submission of costs for payment that are alleged to be unallowable under clause H-20 and the regulations governing the allowability of HO expenses. Moreover, Defendants, citing *Wilson*, appear to argue that the Government's complaint fails to identify any costs that are objectively false, which the court understands to be an argument that the Government's FCA claims are based on differences in interpretation growing out of a disputed legal question—whether regulation and contractual provisions regarding the allowability of HO expenses make the costs that Defendants submitted for payment unallowable.

In response, the Government contends that a determination on whether the M&O contract and regulations make the costs at issue unallowable is premature in a motion under Rule 12(b)(6). It also contends that Defendants' reliance on the rule announced in *Wilson* is misplaced, as that rule should only apply when the difference of interpretation arises from regulatory or contractual provisions that are vague, imprecise, or subjective.

To the extent that Defendants seek dismissal under the rule announced in *Wilson*, the court concludes that Defendants' arguments in this regard are better assessed under the scienter requirement. In *Wilson*, the Fourth Circuit ruled that an FCA claim should be dismissed pursuant to Rule 12(b)(6) if the complaint fails to allege an objective falsehood and that FCA claims resting on "imprecise statements or differences in interpretation growing out of a disputed legal question are . . . not false under the FCA." *Wilson*, 525 F.3d at 377 (internal quotation marks omitted). In

that case, a government contractor agreed to a number of vague requirements, including that the vehicles it provided the government would "meet required vehicle requirements," "be properly equipped and designed to ensure protection of [g]overnment property," and "be maintained in a safe operating condition and good appearance" and that it would "provide the equipment, tools, parts[,] and personnel needed for the maintenance and repair of the vehicles." *Id.* at 374 (internal quotation marks and brackets omitted). The relators alleged that the contractor had submitted false claims for reimbursement from the government because the contractor had failed to meet these safety and maintenance requirements. *Id.* at 374-76. The Fourth Circuit concluded that the contractor's claims for reimbursement, in which it certified that it had met the safety and maintenance requirements, could not be objectively false. *Id.* at 377-78. The Court reasoned that the allegations of falsity were based on the "[r]elators' subjective interpretation of [the contractor's] contractual duties," which were "general," "relatively vague," and "imprecise," such that "it [was] not exactly clear what would qualify as adequate (or inadequate) maintenance." *Id.* The contractor's claims that it had met the safety and maintenance requirements "[did] not qualify as objective falsehoods" because they were not "'expressions of fact which (1) admit of being adjudged true or false in a way that (2) admit of empirical verification.'" *Id.* at 377 (quoting *Harrison I*, 176 F.3d at 792).

Some of the language from *Wilson* may be understood broadly to support dismissal of FCA claims when the underlying falsity is premised on breach of contractual or regulatory provisions, the interpretation of which is disputed by the parties. *Cf. United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190-91 (8th Cir. 2010) (where FCA plaintiffs "base[] their allegation that the statements and the claims made to the government were false on a legal conclusion that federal law required [certain conduct by defendant, and] there is a reasonable

interpretation of the law that does not obligate [that conduct], . . . the [plaintiffs] have not stated a claim under the FCA"); *accord United States ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*, No. 8:08cv48, 2011 WL 976482, at *8-9 (D. Neb. March 15, 2011). However, recent case law strongly suggests that the *Wilson* rule is more limited. In *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015), a relator alleged that a hospital's claims for Medicare reimbursement were false based on the hospital's alleged violation of the Stark Law, which bars such claims if medical services are rendered pursuant to a prohibited referral. 792 F.3d at 370-72. At trial, the hospital, citing *Wilson*, asked the district court to charge the jury that the hospital's claims for reimbursement based on its interpretation of provisions of the Stark Law that were disputed could not be objectively false. *Id.* at 383. In upholding the district court's denial of this request, the Fourth Circuit explained that, unlike in *Wilson*, the hospital

> either complied with the Stark Law or it didn't. This is an objective inquiry. . . . In *Wilson*, there was no either/or proposition of the kind presented [in *Tuomey*]. Rather, in that case, . . . the relators' assertion did not rest on an objective falsehood, "but rather on the [r]elators' subjective interpretation of the defendant's contractual duties."

*Id.* at 384 & n.14. In other words, under the *Wilson* rule, the relevant inquiry is not merely whether the underlying contractual or regulatory provision is subject to dispute; the relevant inquiry is whether the provision is amenable to judicial construction in a way that a court is able to determine whether an FCA defendant's claims comply with the provision. *See United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999) ("[T]his case involves regulations that, while unquestionably technical and complex, are not discretionary. Their meaning is ultimately the subject of judicial interpretation, and it is [the contractor]'s compliance with these regulations, as interpreted by this court, that determines whether its accounting practices resulted in the submission of a 'false claim' under the [FCA].") In *Wilson*, the claims were not falsifiable

precisely because the underlying contractual provisions were not amenable to judicial construction, while, in *Tuomey*, the Stark Law was so amenable, and the claims were falsifiable.

The *Tuomey* Court also suggested that an FCA defendant's argument that its claim is not objectively false due to a dispute over the interpretation of an underlying contractual or regulatory provision is more properly addressed to the scienter element of the FCA. *See Tuomey*, 792 F.3d at 384 ("The subjective inquiry—whether Tuomey knew that its claims were in violation of the Stark Law[—] is covered under the knowledge element.") Outside the immediate context of interpretive disagreement over contractual and statutory provisions, other courts have cautioned against "'adopting a circumscribed view of what it means for a claim to be false or fraudulent,'" noting that, instead, concerns about government overreach generally "'can be addressed through strict enforcement of the [FCA]'s materiality and scienter requirements.'" *Universal Health*, 136 S. Ct. at 2002 (quoting *Sci. Applications*, 626 F.3d at 1270). Still other courts have applied this limitation to the context at issue here. *See Oliver*, 195 F.3d at 463 ("[W]hile the reasonableness of [the contractor]'s interpretation of the applicable accounting standards may be relevant to whether it knowingly submitted a false claim, the question of 'falsity' itself is determined by whether [the contractor]'s representations were accurate in light of applicable law."); *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660, at *9 (C.D. Ill. Oct. 25, 2013) ("[C]ourts typically use the reasonableness of an FCA defendant's interpretation of the applicable law or contract term as part of their determination of whether the defendant acted with the requisite level of knowledge in submitting its claim to the government, not in determining whether the claim was false." (citing *United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008); *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1363 (Fed.

Cir. 1998); *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 316 (S.D.N.Y. 2011))).

Here, Defendants do not contend that the provisions of the M&O contract and of the applicable regulations governing the allowability of HO expenses are so imprecise or vague that they are not amenable to judicial construction such that a court would be unable to determine whether Defendants' claims for reimbursement of loaned employee corporate reachback costs comply with the provisions. In fact, much of Defendants' arguments in support of their motion to dismiss emphasize that an in-depth analysis of the M&O contract and applicable regulations demonstrates that their claims were allowable. Moreover, having reviewed the terms of the M&O contract and the regulations, the court is of the opinion that they are nothing like the vague, general, imprecise terms in *Wilson* from which it is impossible to adjudge a certification of Defendants' compliance with them to be true or false in a way that admits of empirical verification. Accordingly, the court rejects any claim that the complaint's FCA claims should be dismissed for failure to allege objective falsity under the *Wilson* rule. Upon closer inspection, it appears that Defendants' arguments under the *Wilson* rule amount to a contention that their reasonable interpretation of the underlying contractual and regulatory provisions, as alluded to in the complaint, should result in dismissal of the FCA claims. This argument is better addressed to the scienter element, and the court assess it under that element below.

Although the court rejects application of the *Wilson* rule, the court concludes that, at this stage of litigation, it would be appropriate to determine whether the applicable provisions of the M&O contract and regulations makes the challenged costs unallowable. Under the FCA, when the objective falsity of a claim for a government contractor's reimbursement of costs turns on a purely legal determination of whether those costs are allowable under the applicable provisions of the

underlying contract and regulations, it is appropriate to make this determination at the motion-to-dismiss stage. *See United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 155 (D.D.C. 2011) (rejecting FCA claims, in Rule 12(b)(6) context, when, "under the government's theory, the claims are 'false' precisely because they are 'disallowed' by the contract," as permitting such claims to survive would "blur the distinction between fraud and breach of contract"); *United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-cv-2063 (EBB), 2000 WL 1336487, at *7-8 (D. Conn. Aug. 24, 2000) (dismissing FCA claim under Rule 12(b)(6) when falsity of costs submitted for payment under government contract was based on their alleged unallowability under CAS and court concluded that were allowable under CAS). The court notes that addressing a purely legal question as to the objective falsity of the claims in this manner accords with the policy of applying the rigorous falsity, scienter, and materiality requirements, if possible, at the motion-to-dismiss stage. *See Universal Health*, 136 S. Ct. at 2002, 2004 n.6; *Hutcheson*, 647 F.3d at 388; *Sci. Applications*, 626 F.3d at 1270; *Wilson*, 525 F.3d 377-78. The court further notes that the procedures for deciding a Rule 12(b)(6) motion are well-suited to such an endeavor. Under the familiar Rule 12(b)(6) analysis, the court begins by assuming at the outset the facts that all the challenged costs were as characterized by the government and were in fact charged to the government so long as these facts are well-pled. *See Ostrzenski*, 177 F.3d at 251; *Mylan Labs.*, 7 F.3d at 1134. Once these assumptions are made, the only matter left to consider in this particular context is whether the claims were allowable. If the only allegation in the complaint that they were allowable amounts to a legal conclusion, the court is under no obligation to assume this allegation to be true. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). In such circumstances, the court may then determine the validity of the legal proposition advanced in the complaint, and, if the

court concludes the legal proposition is in error, there is no legal basis for concluding that the claim was false, a fundamental requirement of an FCA claim, and the complaint would state only a claim for which the court could not grant relief. *Cf. Kellogg Brown & Root Servs.*, 800 F. Supp. 2d at 155 (rejecting under Rule 12(b)(1) FCA claim based on "government's theory[ that] the claims are 'false' precisely because they are 'disallowed' by the contract" in part because "determining the scope of a contract is a quintessentially *legal*, not *factual*, question").

Here, assuming the truth of the factual allegations in the complaint—that Defendants in fact submitted the challenged costs as described in the complaint for reimbursement and certified that the costs were allowable—each of the Government's FCA claims rests on the legal proposition that these costs were unallowable under the applicable provisions of the M&O contract and regulations. Thus, once the court assumes, as it must, that the claims were as alleged by the Government and were in fact charged to the DOE, the only remaining inquiry for purposes of falsity is whether, as a matter of law, the costs were allowable. In other words, if the court concluded, as a matter of law, that the M&O contract and regulation does not make any of the challenged costs unallowable, then Defendants' claims for reimbursement of the costs are not false, the Government has failed to sufficiently allege an FCA violation, and the complaint does not state a claim based on the FCA for which the court could grant relief. Accordingly, the court concludes that a determination of whether the challenged costs are allowable would be appropriate at this stage.

Rather than having the court make this determination now, Defendants ask that the court request an advisory opinion on the matter from the CBCA, pursuant to 41 U.S.C. § 7107(f).[11] In

---

[11] This section was formerly codified at 41 U.S.C. § 609(f).

1994, section 10 of the Contract Disputes Act ("CDA") was amended to include the following provision:

> Whenever an action involving [any issue that could be the proper subject of a final decision of a contracting officer appealable under 41 U.S.C. ch. 71] is pending in a district court of the United States, the district court may request [the agency board having jurisdiction under this chapter to adjudicate appeals of contract claims under the contract being interpreted by the court] to provide the court with an advisory opinion on the matters of contract interpretation under consideration.

41 U.S.C. § 7107(f)(1)-(3); *see* Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103–355, § 2354, 108 Stat. 3243, 3323 (1994). "This provision was added in response to cases, such as the one at bar, in which the adjudication process set out by the CDA has been superseded due to allegations of fraud." *United States v. United Techs., Corp.*, No. 5:92-cv-375(EBB), 1996 WL 653620, at *3 (D. Conn. Oct. 11, 1996) (citing 140 Cong. Rec. S6519 (June 7, 1994) (statement of Sen. Cochran). Referral to the CBCA under this provision is more appropriate when "the district court might need advice regarding aspects of such claims from a board with expertise in government contracting matters." *Quality Tooling, Inc. v. United States*, 47 F.3d 1569, 1578 (Fed. Cir. 1995). Indeed, it appears that Congress contemplated that the provision would permit government contract issues to continue to be addressed by experts in the subject, such as the CBCA, specifically when, such as in this case, thorny government contract issues must be addressed by the less expert district courts in the context of a claim of fraud. *See* 140 Cong. Rec. S6519; *see also Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 890 (6th Cir. 1998) ("The CDA is intended to keep government contract disputes out of the district courts; it limits review of the merits of government contract disputes to certain forums . . . that have specialized knowledge and experience." (internal quotation marks and alteration omitted)); *accord Goodin v. U.S. Postal Inspection Serv.*, 444 F.3d 998, 1001 (8th Cir. 2006).

As explained above, the legal question faced by the court is whether the challenged costs are allowable under the applicable provisions of the M&O contract and the regulations. Importantly, those provisions implicate interpretation of, and interplay between, the CAS and other agency regulations, part of the normal grist in the administration of government contracts and disputes regarding them. Boards of contract appeals are presumed to have experience and expertise in the administration of government contracts generally and in the resolution of disputes over government contracts specifically. *See Donley v. Lockheed Martin Corp.*, 608 F.3d 1348, 1353 (Fed. Cir. 2010) ("[Courts] give careful consideration and great respect to the [Armed Services Board of Contract Appeals' ("ABSCA")] legal interpretations in light of [its] considerable experience in the field of government contracts." (internal quotation marks omitted)); *Titan Corp. v. West*, 129 F.3d 1479, 1481 (Fed. Cir. 1997) ("[D]ue respect is often warranted by [ABSCA's] experience in interpreting the [FAR].") *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 814 (Fed. Cir. 1984) ("[L]egal interpretations by tribunals having expertise[, here the Department of Energy Board of Contract Appeals,] are helpful to [a reviewing court].")); *Gunnel Constr. Co., Inc. v. District of Columbia*, 551 F.2d 425, 430 (1977) (noting that service on District of Columbia Contract Appeals Board required "practical experience in the administration of government contracts," such that Board's "fundamental character" was "as a body with special expertise and experience in contract administration."); *Info. Sys. & Networks Corp. v. United States*, 48 Fed. Cl. 265, 269 (2000) (noting Court of Federal Claims accords agency contract boards of appeals deference "when such board possesses particular expertise in determining the meaning of the regulation"), *reversed on other grounds*, 437 F.3d 1173. Indeed, as the Fifth Circuit persuasively has explained, "[o]ne has merely to look at the vast body of case law, digests, and treatises to realize that government contracting law is complex, technical, esoteric, important and

monumental. The *raison d'etre* of the various Boards of Contract Appeals is that both expertise and uniformity are needed to resolve adequately and fairly questions within the purview of government contracting law." *In re Gary Aircraft Corp.*, 698 F.2d 775, 779 (5th Cir. 1983); *accord Quality Tooling*, 47 F.3d at 1580; *see also Oliver*, 195 F.3d at 463 (noting that the CAS are "unquestionably technical and complex").

Defendants raise several arguments in favor of the court's referring this matter to the CBCA for an advisory opinion. First, they note, as the court has noted above, that the legal question at issue is one that is particularly suited to the CBCA's technical expertise and experience. (ECF No. 21-1 at 23-24.) Second, they note, as again the court has already noted, that the circumstances of this case—involving a claim of fraud that largely rests on the interpretation of provisions in a government contract and in agency regulations—are those for which the § 7107(f) advisory opinion provision specifically was created. (*Id.* at 24.) Third, they note that, on May 19, 2016, SRNS filed a complaint in the CBCA against the DOE, seeking, in large part, a determination on whether the challenged costs are allowable under the M&O contract and applicable regulations. (*Id.* at 24-25; *see* ECF No. 41). Thus, they assert, referral to the CBCA for an advisory opinion not only would be helpful to the court but also would be efficient as the CBCA may rule on the very issue on which the Government's FCA claims rest. (ECF No. 21-1 at 25.)

In response, the Government concedes the CBCA's "considerable experience and expertise in interpreting government contracts." (ECF No. 26 at 22 (internal quotation marks omitted).) However, the Government argues that an advisory opinion is unnecessary at the pleading stage, apparently because it believes it would be premature to determine, in a Rule 12(b)(6) motion, whether the challenged costs were allowable. (*Id.*) The court, however, has already rejected this contention. The Government also argues that referral is unnecessary because, it asserts, the district

court can competently decide the contractual issues raised by the FCA claims as easily as it might decide any dispute over contractual interpretation. (*Id.*) Though flattering, this argument simply elides the fact that the CBCA and the other boards of contract appeals were formed specifically because, whatever the district court's expertise or experience in this arena, theirs would exceed it.

The Government lastly argues that the efficiency gained from referral to the CBCA may prove illusory. In the Government's estimation, referral under § 7107(f) would create a costly and lengthy additional procedural step in the litigation of its FCA claims, with little chance of arriving at an advisory opinion that would enable the court to dispose of the case. (*Id.* at 25-26.) For support, the Government cites one of the editors of a leading treatise who, after weighing the pros and cons, muses that he would not "volunteer [his] company as the client to take this trip the first time." Ralph C. Nash & John Cibinic, *District Courts Can Seek Advisory Opinions from Boards of Contract Appeals: Will It Ensure a Consistent Body of Government Contract Law?*, 9 No. 5 Nash & Cibinic Rep. ¶ 31 add. (1995). The Government also notes that the DOE has moved to dismiss the complaint in the CBCA for lack of jurisdiction, which, if granted, would rule out any supposed efficiencies from having the CBCA consider the referral concurrently. (ECF No. 26 at 23; *see* ECF Nos. 41-1, 41-2, 41-3.)

The court is not persuaded by the Government's arguments. Regarding the claimed inefficiencies created by seeking a § 7107(f) advisory opinion, the court concludes that the Government's arguments are largely conjectural. As the brief commentary from the editor on which the Government relies indicates, that reasoning was born out of speculation on how § 7107(f) might operate, not on the editor's first-hand experience. This is evidenced from the fact that the article was published less than a year after the CDA was amended to include the provision and the fact that the editor confided that he did not wish to be the first to experiment with the new

provision. Other authorities come to the opposite conclusion in similar contexts. *See* Thomas F. Williamson, et al., *Government Contract Cases in the United States Court of Appeals for the Federal Circuit*, 45 Am. U. L. Rev. 1657, (1996) (noting that bankruptcy courts should seek advisory opinions from boards of contract appeals "in the interest of judicial economy"). In the end, it is not clear what efficiencies would be gained or lost from referral because § 7107(f) has rarely, if ever, been used. *See* Marcia G. Madsen & Gregory A. Smith, *The Court of Federal Claims in the 21st Century: Specific Proposals for Legislative Changes*, 71 Geo. Wash. L. Rev. 824, 847 (2003). Regarding the motion to dismiss the complaint filed in the CBCA, the court accepts the potential consequence that the DOE might prevail and thereby undermine the efficiencies to which Defendants have pointed.

In the final analysis, the court concludes that the likely benefits to be gained from an advisory opinion—in terms of employing the expertise of a forum dedicated to the administration of government contracts and furthering the uniformity needed in that area—which animated the creation of § 7107(f), far outweigh the potential for increased inefficiency in the instant litigation. Accordingly, the court will refer the matter to the CBCA for an advisory opinion and stay proceedings in the case until it is received.

*b. Scienter*

To satisfy the second FCA element, the Government must sufficiently allege that those responsible for submitting an objective falsehood acted knowingly in so doing. *United States ex rel. Becker v. Westinghouse Savannah River Co.,* 305 F.3d 284, 288 (4th Cir. 2002). The FCA defines "knowingly" to mean that "a person, with respect to information has actual knowledge of the information;" "acts in deliberate ignorance of the truth or falsity of the information;" or "acts in [deliberate or] reckless disregard of the truth or falsity of the information." 31 U.S.C.

§ 3729(b)(1)(A). Thus, scienter can be established in any one of three ways (*i.e.*, proof of actual knowledge, deliberate ignorance, or deliberate or reckless disregard) and does not require any "proof of specific intent to defraud." *Id.* § 3729(b)(1)(B).

With respect to this element, Defendants raise three arguments. First, Defendants argue that the complaint makes plain their belief that the challenged costs were allowable and, thus, forecloses any allegation that they knowingly submitted false claims. (*See* ECF No. 21-1 at 31-33.) By raising this argument, the court understands that Defendants essentially seek to show that the complaint's express allegations that Defendants had knowledge that their claims for the challenged costs were unallowable and thus false should not be accorded the presumption of truth. As the Government correctly points out, "[t]he second sentence of Rule 9(b) allows conclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive." *Harrison I*, 176 F.3d at 784. However, "an FCA plaintiff still 'must set forth specific facts that support an inference of fraud.'" *Wilson*, 525 F.3d at 370 (quoting *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375 (5th Cir. 2008)).

Defendants briefly argue that the Government's complaint lacks sufficient factual allegations supporting an inference of the requisite scienter. (*See* ECF No. 31 at 14-16.) The court disagrees. Read in the light most favorable to the Government, the relevant factual allegations and reasonable inferences therefrom, which are contained in the complaint, are that the Government did not become aware that the challenged costs were being included in draws upon the letter of credit until May 20, 2011, (when Ahlstrom informed the DOE of Defendants' position that FFS loaned employee expenses were allowable); that Defendants did not inform the Government that these costs were being charged until that date and only after Defendants were forced to play their hand; and that Defendants secretly amended the CTA in an effort to hide which of FFS' costs were

being charged to the DOE and to provide evidentiary support that they held an interpretation of the M&O contract under which the costs were allowable, which in fact was pretextual. The court concludes that these factual allegations are sufficient for purposes of pleading scienter.

Although they take a passing shot at the general pleading standards for scienter, primarily, Defendants' arguments in this regard are aimed at showing that the specific allegations of the complaint and the documents under consideration belie the Government's conclusory allegations of knowledge. (*See* ECF No. 21-1 at 31-33.) When a complaint's general conclusory allegation of intent is contradicted by specific factual allegations in the complaint, the latter control, and the court is not obligated to accept the general allegation as true in deciding a Rule 12(b)(6) motion. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007); *Carson Optical Inc. v. eBay Inc.*, No. 15-cv-3793 (KAM) (SIL), ___ F. Supp. 3d ___, 2016 WL 4385998, at *5 (E.D.N.Y. Aug. 17, 2016) (collecting cases). Likewise, as a general rule, "'in the event of conflict between the bare allegations of the complaint and any exhibit attached to the complaint, the exhibit prevails.'" *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (alteration omitted) (quoting *Fayetville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)); *accord Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013); *Irvin*, 496 F.3d at 1205-06.

Defendants argue that the internal audit report they attached to their motion to dismiss contradicts the general allegations in the complaint that they knew the challenged costs were unallowable. There are a number of problems with this argument. To start with, it is far from clear that the rule expressed by *Broadlands* should apply to an exhibit attached to a *defendant's* motion to dismiss rather than to a *plaintiff's* complaint. *See F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 63 (11th Cir. 2013) (noting basis for rule stems in part from Fed. R. Civ. P. 10(c), which applies to

exhibits attached to "pleadings").[12] Furthermore, the portion of the internal audit report on which Defendants rely to demonstrate that they believed certain costs were allowable refers to costs that are not the subject of the complaint. (*Compare* ECF No. 21-1 at 25-26 (relying on SRNS's statements relating to costs of non-loaned employees contained in report), *with* ECF No. 26 at 33 n.17 ("[*N*]*on-loaned* employees [are] employees that are not performing duties at the Savannah River Site[ and] are *not* part of this lawsuit. This suit concerns only loaned employees, who by definition perform their duties at the Savannah River Site." (internal citation omitted)).) And, even if the court determined that it should consider the internal audit report in the manner Defendants suggest, it does nothing to undermine the factual allegations of the complaint demonstrating that Defendants developed their interpretation of the M&O contract for the purposes of pretext, which would satisfy the FCA scienter requirement that the Government allege that Defendants acted with deliberate or reckless disregard of the falsity of their claims. *See Oliver*, 195 F.3d at 463 n.3 (explaining that one reason the reasonableness of an FCA defendant's interpretation of a contract

---

[12] The Fourth Circuit's recent discussion in *Goines*, though not directly on point, is noteworthy:

> [B]efore treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it.
>
>      . . . .
>
> The purpose for which the document is offered is particularly important where the document is one prepared by or for the defendant. Such unilateral documents may reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff. Treating the contents of such a document as true simply because it was attached to or relied upon in the complaint, even though the plaintiff relied on it for purposes other than truthfulness, would be contrary to the concept of notice pleading and would enable parties to hide behind untested, self-serving assertions.

822 F.3d at 167-68 (internal quotation marks omitted).

should not be assessed under the falsity requirement is that it "could submit a claim, knowing it is false or at least with reckless disregard as to falsity, thus meeting the intent element, but nevertheless avoid liability by successfully arguing that its claim reflected a "reasonable interpretation" of the requirements"); *Commercial Contractors*, 154 F.3d at 1366 ("If a contractor submits a claim based on a plausible but erroneous contract interpretation, the contractor will not be liable, *absent some specific evidence of knowledge that the claim is false or of intent to deceive*." (emphasis added)); *Chilcott*, 2013 WL 5781660, at *9 (explaining that, even in face of plausible interpretation of underlying contract, there may still be sufficient allegations of specific evidence of knowledge that claim is false).

Defendants next argue that the 2013 and 2015 annual certifications submitted by SRNS officers to the DOE, in which, as described in the complaint, SRNS stated Defendants' position that the loaned employee costs were allowable, conflict with the complaint's general allegations of knowledge. (ECF No. 21-1 at 32.) The court rejects this argument because, as discussed in the preceding paragraph, this specific allegation does not undermine the factual allegations of secrecy and pretext. *See Commercial Contractors*, 154 F.3d at 1366; *Chilcott*, 2013 WL 5781660, at *9.

Defendants lastly argue that the Government's allegation that the original CTA demonstrates that Defendants knew the challenged costs were unallowable should not be credited. The court agrees with this argument because such an allegation would rest on an interpretation of the CTA—that it regards the costs at issue as unallowable—which would amount to a legal conclusion, which the court need not accept as true in deciding a Rule 12(b)(6) motion. *See Iqbal*, 556 U.S. at 678; *Kellogg Brown & Root Servs.*, 800 F. Supp. 2d at 155. To the extent the complaint contains such an allegation, the court has not relied on it in assessing scienter. Nevertheless, for

the reasons set forth in the preceding paragraphs, the court concludes there is sufficient factual allegations of the requisite scienter.

Second, aside from directly attacking allegations regarding their knowledge, Defendants also argue that the DOE's knowledge of claims for reimbursement of the challenged costs undermines the pleading of scienter such that the FCA claims should be dismissed. "[I]t is well-settled in the Fourth Circuit that 'the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation.'" *United States ex rel. Davis v. Prince*, No. 1:08cv1244, 2011 WL 2749188, at *4 (E.D. Va. July 13, 2011) (quoting *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (collecting cases from four other courts of appeal)). The rationale appears to be that an FCA defendant could not have believed that the claim was false if the government with full knowledge of the facts accepted the claim as not false. *See United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). Citing a Fifth Circuit case, Defendants also note that a "government knowledge" argument is permitted "primarily in the rare situation where the falsity of a claim is unclear and the evidence suggests that the defendant actually believed his claim was *not false* because the government approved and paid the claim with full knowledge of the relevant facts." *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 686 (5th Cir. 2002), *vacated and reh'g granted*, 307 F.3d 352, *cited with approval in Becker*, 305 F.3d at 289; *see also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 952 (10th Cir. 2008) (noting government knowledge argument "arises when the government knows and approves of the facts underlying an allegedly false claim prior to presentment"). Defendants rely on similar language from the Fourth Circuit, stating that the argument is applicable when the government "was completely aware from the inception of the contract" of the nature of the claims and "willingly acquiesced" in them. *United*

*States ex rel. Bennett v. Genetics & IVF Inst., Inc.*, 199 F.3d 1328, at *3 (4th Cir. 1999) (unpublished table disposition).

The court concludes that the DOE's knowledge is of no aid to Defendants at this stage. Contrary to Defendants' assertion, nothing in the complaint or the documents considered demonstrates that the DOE was aware that the challenged costs were being charged to it until May 20, 2011. Thus, the government knowledge argument is inapplicable to any costs charged before that date. With respect to costs charged after that date, although the DOE continued to pay them through its letter of credit, nothing in the complaint or documents considered demonstrates that the DOE "approved" of the claims or "willingly acquiesced" in them or that Defendants believed that the costs were allowable *because* the DOE continued to pay the claims. On the contrary, the complaint alleges that the DOE, though continuing to pay the claims, strenuously objected to them soon after being made aware of them. Further, the complaint alleges, and the documents demonstrate, that the sole reason for Defendants' purported belief that the costs were allowable was their interpretation of the contract (which the DOE contested), not the DOE's decision to continue making payments. In short, the allegations of the complaint do not support the conclusion that Defendants could not have believed that their claims were false based on the DOE's full knowledge and acceptance of the claims.

Third, as explained in the preceding subsection of this order regarding the falsity requirement, Defendants' arguments regarding the reasonableness of their interpretation of the applicable M&O contract and regulatory provisions governing HO expenses are best addressed under the scienter requirement. *Oliver*, 195 F.3d at 463; *Chilcott*, 2013 WL 5781660, at *9. Although the Fourth Circuit has only recently suggested so, *see Tuomey*, 792 F.3d at 384, a number of other courts have held that, pursuant to the knowledge requirement, a contractor is not liable

under the FCA, if the claims at issue were submitted with nothing more regarding scienter than that the contractor believed the claims were valid under its interpretation of the underlying contract or regulation. However, courts that have adopted this view require some indication that the contractor's interpretation was not the product of mere afterthought in an attempt to escape the scienter requirement. Although courts have formulated different tests for this purpose, *see, e.g.*, *United States ex rel. Purcell v. MWI Corp*, 807 F.3d 281, 290 (D.C. Cir. 2015); *United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1191 (8th Cir. 2010); *Oliver*, 195 F.3d at 464; *Commercial Contractors*, 154 F.3d at 1366, most tests involve a determination whether the contractor's interpretation was reasonable, *see Chilcott*, 2013 WL 5781660, at *6-9.

The court declines to determine here whether Defendants' interpretation of the M&O contract and regulations precludes FCA liability because of the scienter requirement. Because it has already determined that it will seek an advisory opinion from the CBCA on whether the M&O contract and regulations make the challenged costs unallowable, it would be incongruent to assess the reasonability of Defendants' interpretation on that same issue in this order. Instead, the court concludes that it would be appropriate to request the CBCA, in addition to opining on the allowability of the challenged costs, to also opine on the reasonableness of Defendants' interpretation regarding the allowability of the challenged costs.

### c. Materiality

"Liability under each of the provisions of the [FCA] is subject to the . . . judicially-imposed[] requirement that the false statement or claim be material." *Harrison I*, 176 F.3d at 785. "Under the FCA, a statement or course of conduct is material if it 'has a natural tendency to influence agency action or is capable of influencing agency action.'" *Wilson*, 525 F.3d at 378

(quoting *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997)).

Defendants contend that the Government's complaint fails to adequately allege that the claims and certifications at issue were material to the Government's decision to pay, and they raise three arguments in support of this contention. First, Defendants argue that the DOE's knowledge and approval of the challenged costs negates the requisite materiality. (ECF No. 21-1 at 36-37.) Much of this argument rests on the assertion that the DOE knew and approved of the challenged costs because SRNS made the DOE aware that it intended to charge those costs in its proposal in response to the RFP. (*Id.* (citing *Harrison I*, 176 F.3d at 787-89; *Bennett*, 199 F.3d, at *3).) Because the proposal is not properly before the court and because neither the complaint nor the documents the court considers at this stage may be read for the factual allegation that Defendants here assert, the court rejects this argument.

Second, Defendants note that the complaint alleges that FFS submitted a number of invoices to SRNS that contained certifications that the invoices were in accordance with the M&O contract. (ECF No. 21-1 at 37; *see* ECF No. 1 at 14.) Defendants assert that the complaint fails to allege that these certifications were made to the DOE or that the DOE otherwise knew of them and, therefore, that the certifications could not have influenced the DOE's decision to pay the invoices. (ECF No. 21-1 at 37.)

The court rejects this argument. The FCA applies both to claims presented for payment or approval and to the use of records or statements that are material to such claims. 31 U.S.C. § 3729(a)(1)(A)-(B). A "claim" includes "any request or demand . . . for money . . . presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2)(A)(i). The term also includes "any request or demand . . . for money . . .  made to a contractor" so long as the claimed money

"is to be used or spent on the Government's behalf or to advance a Government program or interest" and the Government either "provides any portion of the money . . . or will reimburse such contractor . . . for any portion of the money which is requested or demanded." *Id.* § 3729(b)(2)(A)(ii). Thus, the FCA applies to a request for money made by a third party (often, a subcontractor) to a prime contractor if the money is used in furtherance of a government program and the government provides the money or will reimburse the money to the prime contractor. The FCA also applies to statements made by a subcontractor to a prime contractor if the statement is material to the prime contractor's request or demand for money presented to a federal agency. Interpreting old § 3729(a)(2), the Supreme Court said as much in *Allison Engine*:

> a subcontractor violates [old] § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim. If a subcontractor or another defendant makes a false statement to a private entity and does not intend the Government to rely on that false statement as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim "by the Government." In such a situation, the direct link between the false statement and the Government's decision to pay or approve a false claim is too attenuated to establish liability.

553 U.S. at 671-72 (footnote omitted). The Court further explained that the intent requirement—that a defendant whose statement was made to a third party cannot be liable under old § 3729(a)(2) unless the defendant intended the government to rely on the statement as a condition of payment—was based on old § 3729(a)(2)'s use of the phrase "to get." *Id.* at 671 n.2. As a number of courts have recognized, the 2009 FERA amendments to the FCA were intended to overrule the intent requirement imposed by *Allison Engine*. (*See supra* note 8 (citing *Wall*, 697 F.3d at 355 n.3; *Chesbrough*, 655 at 466 n.2; *Steury*, 625 F.3d at 267 n.1).) What remains untouched from *Allison Engine* is that an FCA defendant (such as a subcontractor) may be liable for statements made to a third party (such as a prime contractor) which the prime contractor uses in its claim for payment

47

or approval from the government. *See* Steven L. Briggerman, *False Claims Act Amendments: A Major Expansion in the Scope of the Act*, 23 No. 11 Nash & Cibinic Rep. ¶ 58 (2009) ("[N]ow a subcontractor or other third party can be liable under the FCA if its false claim would influence the Government's decision to make payment, even though the claim had not been directly submitted to the Government and there was no evidence that the subcontractor intended the Government to rely on it.")

There is no doubt in the court's mind that the complaint sufficiently alleges the circumstances for which *Allison Engine* and the FCA, as amended by FERA, impose liability against a defendant who submits a statement to a third party and not directly to the government. The issue presented by Defendants' argument is whether, in such a circumstance, the fact that the government was not aware of the statement made by the defendant to the third party forecloses any allegation that the statement was material to the government's decision to act, a separate judicially-imposed requirement of FCA liability. Defendants cite no authority in support of the proposition that materiality cannot be proved when the government is unaware of the underlying statement, but this is not surprising, as the court's own research has unearthed no authority that directly addresses the issue. However, based on what can be gleaned from the relevant authorities, the court concludes that, in this case, the Government's failure to allege that the DOE was aware of FFS's certifications to SRNS does not require the court to conclude that it has failed to sufficiently allege materiality.

The test for materiality—whether the representation "has a natural tendency to influence agency action or is capable of influencing agency action," *Wilson*, 525 F.3d at 378 (internal quotation marks omitted)—is one that has been used in many contexts outside claims for FCA violations. *See Universal Health*, 136 S. Ct. at 2002 (citing *Neder v. United States*, 527 U.S. 1

(1999), which used test in context of "mail, bank, and wire fraud statutes," and *Kunygs v. United States*, 485 U.S. 759 (1988), which used it in context of "fraudulent statements to immigration officials"); *United States v. Garcia-Ochoa*, 607 F.3d 371, 375-76 (4th Cir. 2010) ("This test applies in numerous contexts, including both [18 U.S.C.] §§ 1001 and 1546(a), to assess materiality whenever it is an element of a statutory offense."); *Berge*, 104 F.3d at 1459 (borrowing test from "the *criminal* false statement statute, 18 U.S.C. § 1001," as set forth in *United States v. Norris*, 749 F.2d 1116, 1122 (4th Cir. 1984), *abrogated on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995), *as recognized in Berge*, 104 F.3d at 1459). When the test has been applied in contexts outside the FCA, it is clear that a defendant's statement made to a third party but not disclosed to the government can yet be material, especially when the third party has some obligation to forward the information contained in the statement to the government or when the government otherwise has the right or ability to access the information. *See Garcia-Ochoa*, 607 F.3d at 377 ("The defendant suggests . . . that the I-9 Form is incapable of influencing *government* action because it is submitted in the first instance to *private* employers. This view is mistaken. . . . [W]here Congress has specifically provided for agency access to I-9 Forms, the fact that an agency may not avail itself of the opportunity to review each and every I-9 Form in no way lessens the form's significance."); *United States v. Berger*, 473 F.3d 1080, 1103-04 (9th Cir. 2007) ("Though the indictment did not specifically mention materiality, the indictment indicated that: (1) [defendant] had made a false statement regarding an offer for land; (2) the statement was within the jurisdiction of the Park Service, which would only purchase through a specific third-party nonprofit agency; (3) the Park Service would purchase land only if it had an appraisal; and (4) [defendants] had given his false statement to the third party . . . Surely these allegations warrant the inference of materiality of [defendant]'s false statement." (internal quotation marks and alteration omitted) (citing *United*

*States v. Oren*, 893 F.2d 1057, 1063-64 (9th Cir. 1990))); *United States v. Corsino*, 812 F.2d 26, 31 (1st Cir. 1987) ("Statements may be material even if ignored and never read by the agency." (citing *United States v. McIntosh*, 655 F.2d 80, 83 (5th Cir. Unit A Sept. 1981); *United States v. Diaz*, 690 F.2d 1352, 1358 (11th Cir. 1982))), *abrogated on other grounds by United States v. Yermian*, 468 U.S. 63 (1984), *as recognized in United States v. Gonsalves*, 435 F.3d 64 (1st Cir. 2006); *United States v. Petullo*, 709 F.2d 1178, 1180 (7th Cir. 1983) ("A false statement may fall within section 1001 even when it is not submitted to a federal agency directly and the federal agency's role is limited to financial support of a program it does not itself directly administer. In such cases, the necessary link between deception of the non-federal agency and effect on the federal agency is provided by the federal agency's retention of the ultimate authority to see that the federal funds are properly spent. Moreover, since it is the *existence* of federal supervisory authority that is important, not necessarily its *exercise*, it does not matter that the early discovery of the fraud by the [non-federal agency] kept the false information from actually reaching the federal government." (internal citations and quotation marks omitted)); *United States v. Lawrence*, No. 2:14-cr-00157, 2015 WL 586866, at *9 (S.D.W. Va. Feb. 27, 2015) (finding no materiality in case involving "merely a private individual providing false statements to a private entity that is under no obligation to provide that information to a federal entity"). At least one scholarly authority has suggested that the fact that the government is not aware of the underlying claim in an FCA case is not alone dispositive of materiality. *See* Steven L. Briggerman, Allison Engine Co. v. U.S. ex rel. Sanders*: Liability of Subcontractors and Other Third Parties under the False Claims Act*, 23 No. 1 Nash & Cibinic Rep. ¶ 1 (2009) ("[I]t is now possible to bring a[n FCA] action against a subcontractor or other third party in a Government-funded program without a showing that the false claim was actually presented to the Government.").

Here, although the Government has not alleged that the DOE was aware of the certifications FFS made on its invoices to SRNS, it has alleged that, in these certifications, FFS stated that its invoices were in accordance with the M&O contract; that SRNS sent annual certifications to the DOE, stating that the costs it charged were in accordance with the M&O contract; that SRNS was obligated by the M&O contract to provide these annual certification; and that some of these annual certifications made reference to costs of FFS loaned employees that were the subject of FFS's certifications. (*See* ECF No. 1 at 14-20.) In other words, reading it in the light most favorable to the Government, the complaint alleges either that SRNS had an obligation to forward to the DOE the information contained in FFS's certifications or that the DOE otherwise had the right or ability to access such information. These allegations meet the materiality requirement under the test for materiality as it has been applied in other contexts.

This result accords with the common law understanding of materiality for actions in tort. *See Universal Health*, 136 S. Ct. at 2002-03 (assessing FCA materiality under standards set forth in 26 Richard Lord, *Williston on Contracts* § 69:12, p. 549 (4th ed. 2003) and Restatement (Second) of Torts § 538 (1976)). In common law tort, "[t]he maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, *although not made directly to the other, is made to a third person* and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." Restatement (Second) of Torts § 533 (emphasis added); *see id.*, cmt. f. As the Supreme Court in *Universal Health* noted, a non-disclosure in the tort context is material if it meets either of two tests: "(1) 'if a reasonable man would attach importance to it in determining his choice of action in the transaction'; or (2) if the defendant knew or had reason to know that the

recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not." 136 S. Ct. at 2002-03 (brackets omitted) (quoting Restatement (Second) of Torts § 538). Only the latter of these tests for materiality by its terms requires the injured party to be a "recipient of the representation," suggesting that the former test imposes no such requirement. The fact that the common law's test of materiality in the tort context would not require the plaintiff to be aware of the representation supports the court's conclusion that the DOE's not being aware of FFS's certifications is not dispositive of materiality.

Third, Defendants argue that the annual certifications made by SRNS to the DOE were not material. (ECF No. 21-1 at 38.) In Defendants' estimation, the complaint does not connect the annual certifications to any submission or payment of a claim, and, they argue, general certifications of compliance with a contract do not meet the materiality requirement. (*Id.* (citing *United States ex rel. Watkins v. KBR, Inc.*, 106 F. Supp. 3d 946, 956-57 (C.D. Ill. 2015); *United States ex rel. McLain v. KBR, Inc.*, No. 1:08-cv-499 (GBL/TCB), 2013 WL 710900, at *8 (E.D. Va. Feb. 27, 2013)).) Contrary to Defendants' assertion, the complaint sufficiently alleges a causal relationship between the annual certifications and the DOE's approval and payment of the claims. The complaint alleges that the annual certifications were required by the M&O contract; that, in them, SRNS was obligated to certify that the costs it charged on a daily basis were allowable; that the alleged non-disclosure of HO expenses in the annual certifications prompted an OIG investigation that resulted in the CO's concluding that the costs, past and present, were unallowable and in a demand from that DOE that SRNS cease charging DOE for the costs. (ECF No. 1 at 13-15.) Moreover, although the authorities cited by Defendants might be read for the proposition that general certifications of compliance with a contract are not always material to the government's decision to pay, under *Universal Health*, the court does not believe the mere fact

52

that the government's FCA claim rests on an alleged falsity in a general certification is dispositive of materiality. *See* 136 S. Ct. at 2003-04 (providing non-exhaustive list of factors probative of materiality). Even before *Universal Health* addressed the FCA's materiality requirement, the Fourth Circuit required that, in such circumstances, the government need only "allege the false statement had a natural tendency to influence, or be capable of influencing, the [g]overnment's decision to pay." *Triple Canopy*, 775 F.3d at 637 (internal quotation marks omitted). In *Triple Canopy*, the Court determined that the government's complaint contained sufficient allegations for materiality because (1) "common sense strongly suggest[ed]" that, in a contract for security services, the government would find it material that the security guards "could not . . . shoot straight," and (2) the contractor's alleged conduct in "covering up the guards' failure . . . suggests its materiality." *Id.* at 638. Here, common sense suggests that the alleged unallowability of the challenged costs would influence the DOE's decision to pay them, and Defendants' alleged conduct in covering up the costs suggests that they would be material to the DOE. These allegations are sufficient for purposes of satisfying the materiality requirement at this stage.

   *d. Pleading standards*

  At various points throughout their arguments regarding falsity, scienter, and materiality, Defendants also contend that the complaint fails to meet the *Twombly-Iqbal* plausibility standard or the Rule 9(b) particularity standard with respect to the FCA claim based on HO expenses. Some of these contentions already have been touched upon in the court's discussion above, but the court now turns to addressing the contentions more directly.

  First, Defendants assert that the Government has failed to plausibly allege that SRNS submitted false claims to the DOE because, they argue, it has not sufficiently alleged that the claims for reimbursement for the challenged costs of FFS loaned employees was unallowable

under the M&O contract and applicable regulations. (*See* ECF No. 21-1 at 15-16.) In Defendants'
estimation, the complaint's accusations of falsity boil down to only two allegations: (a) the
challenged costs are unallowable under the M&O contract and regulations, and (b) SRNS
submitted claims to the DOE that included the challenged costs. (*See id.* at 16.) The first of these
allegations, Defendants assert, amounts to a legal conclusion that is not rightly accorded the
presumption of truth in deciding a Rule 12(b)(6) motion. (*Id.* (citing *Iqbal*, 556 U.S. at 678;
*Kellogg Brown & Root Servs.*, 800 F. Supp. 2d at 155).) The second allegation, they assert, is
simply not supported by sufficient factual matter, such as allegations regarding which entities
count as HOs and which of their expenses count as HO expenses, and thus fails the requirements
of Fed. R. Civ. P. 8(a). (*Id.*)

The court accedes to Defendants' characterization of the complaint for purposes of
disposing of this argument but does not conclusively agree with that characterization. Having so
acceded, the court agrees with Defendants that the first allegation amounts to a legal conclusion
that is not accorded the presumption of truth. However, the court disagrees with Defendants'
assertion that the second of the allegations lacks sufficient factual detail for purposes of Rule 8(a).
Having provided the relevant legal framework for its argument, *see Iqbal*, 556 U.S. at 679 ("While
legal conclusions can provide the framework of a complaint, they must be supported by factual
allegations.")—that the relevant provisions of the M&O contract and regulations make HO
expenses unallowable—the Government need only allege, with sufficient factual detail, that SRNS
submitted claims that were unallowable because they included HO expenses. The complaint does
just that and even provides the information that Defendants assert it neglected. Which entity's
expenses are alleged to have been claimed? FFS's. Which of FFS's expenses? Those for FFS
loaned employees under the reachback program. Moreover, the complaint provides even more

detail regarding the claimed expenses and their falsity. It alleges that the expenses were invoiced by FFS to SRNS under the auspices of the CTA which governed FFS's reimbursement for loaned employee costs. As discussed above, it also alleges, with sufficient factual detail, that Defendants concocted their legal theory as a pretext, which supports an allegation of falsity, as contractors are unlikely to concoct pretextual legal theories for costs that are not objectively false. Because the Government's complaint contains sufficient factual detail to support the allegation of submission of false claims, the court rejects Defendants' argument.[13]

Second, Defendants argue that the complaint fails to allege a fraudulent scheme with the particularity required by Rule 9(b). (*See* ECF No. 21-1 at 28-29.) The court rejects this argument too. As an initial matter, the court notes that FCA liability does not hinge on alleging or proving the existence of a fraudulent scheme. *See Takeda*, 707 F.3d at 456 ("[T]he critical question is whether the defendant caused a false claim to be presented to the government, because liability under the [FCA] attaches only to a claim actually presented to the government for payment, not to the underlying fraudulent scheme." (citing *Harrison I*, 176 F.3d at 785)). Even so, the court concludes that the complaint does allege a fraudulent scheme with the particularity required by Rule 9(b). As the court already has explained, the complaint alleges that Defendants engaged in a pretextual ruse to cover up claims for HO expenses they knew to be fraudulent. Regardless whether it is ultimately proved true, this allegation is supported by sufficient factual detail at this stage.

Third, Defendants argue that the complaint fails to sufficiently identify, for purposes of Rule 9(b), which person or persons directed unallowable costs be charged to the DOE. (*See* ECF No. 21-1 at 29-30.) The court rejects this argument as well. First off, the complaint does specify

---

[13] To the extent that Defendants also argue that the complaint fails to sufficiently specify which particular costs were improper HO expenses (*see* ECF No. 21-1 at 29), the court rejects this argument for the same reasons.

that SRNS and FFS management personnel are at fault for causing the claims to be submitted to the DOE, and it names particular individuals who certified that the claims did not include costs made unallowable by the M&O contract and regulations. More importantly, although a plaintiff alleging fraud will always have an easier time surviving a Rule 9(b) challenge if it names the individuals directing or engaging in a corporation's fraudulent activities, the failure to do so, alone, is not fatal to an FCA claim. *See United States ex rel. Bledsoe v. Comty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007) (rejecting argument that plaintiff "must plead the identity of the specific individual employees within the defendant corporation who submitted the false claims to the government" because "while such information is relevant to the inquiry of whether a relator has pled the circumstances constituting fraud with particularity" "such a requirement is not required by the FCA itself or the text of Rule 9(b)"). *Ahumada*, which Defendants cite (ECF No. 21-1 at 29-30), is not to the contrary, as it only requires an FCA plaintiff to identify which defendant—meaning which defendant corporation, not individuals within a defendant corporation—is responsible for each false claim alleged. *See* 756 F.3d at 281 n.9.

To the extent that Defendants have raised any other arguments regarding the complaint's failure to meet the pleading standards, the court has already addressed those arguments elsewhere in this order. In sum, the court concludes, that the allegations of the complaint with regard to FCA claims for HO expenses are sufficient to meet the *Twombly-Iqbal* plausibility standard and Rule 9(b)'s particularity requirements.

**B. Other claims**

Aside from the three counts for FCA violations, the Government's complaint also contains three common-law counts—one for breach of contract, one for unjust enrichment, and one for payment by mistake. Defendants move to dismiss all three of these counts.

1. Breach of contract claim

The Government alleges that the M&O contract between the DOE and SRNS makes unallowable HO expenses and B&P costs and requires SRNS to certify its compliance with these terms. (ECF NO. 1 at 23.) The Government further alleges that SRNS breached the contract by charging HO expenses and B&P costs to the DOE and by failing to provide truthful certifications. (*Id.*) In their motion to dismiss, Defendants argue that, pursuant to the CDA, the court lacks jurisdiction over a breach-of-contract claim between the federal government and its contractor and that the claim should be dismissed pursuant to Rule 12(b)(1). (ECF No. 21-1 at 40-41.)

Under the CDA, all claims by the government against a contractor relating to a procurement contract are subject to the decision of a contracting officer, with appeal to the applicable board of contract appeals or the Court of Federal Claims, and may not be brought in federal district court. *See* 41 U.S.C. §§ 7103(a), 7104; *U.K Ministry of Def. v. Trimble Navigation, Ltd.*, 422 F.3d 165, 166, 168-69 (2005); *see also Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1139 (9th Cir. 2013) (citing *Menominee Indian Tribe v. United States*, 614 F.3d 519, 521 (D.C. Cir. 2010)); *United Fed. Leasing, Inc. v. United States*, 33 F. App'x 672, 674 (4th Cir. 2002); *United States v. Unified Indus., Inc.*, 929 F. Supp. 947, 948-51 (E.D. Va. 1996). However, courts have held that the CDA's mandatory jurisdiction does not apply to a claim by the federal government against a contractor "involving fraud," as that phrase is used in the CDA. *See United States v. United Techs. Corp.*, 626 F.3d 313, 323-25 (6th Cir. 2010); *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 67, 80 (D.D.C. 2015); *Unified Indus.*, 929 F. Supp. at 948-51; *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F. Supp. 218, 224 (D. Md. 1995). Courts that have addressed the issue have viewed the phrase "involving fraud" to except from the CDA's exclusive jurisdictional provision "not only causes of action for fraud in particular, but also actions the factual bases of

which are intertwined with allegations of fraud." *Unified Indus.*, 929 F. Supp. at 950-51; *accord United States v. First Choice Armor & Equip., Inc.*, 808 F. Supp. 2d 68, 80 (citing *Kellogg Brown & Root Servs.*, 800 F. Supp. 2d at 160). And where a breach-of-contract claim is based on the same factual allegations as an FCA claim, the CDA does not deprive federal district courts of jurisdiction over the breach claim. *See Shemesh*, 89 F. Supp. 3d at 80; *Unified Indus.*, 929 F. Supp. at 951; *Mayman*, 894 F. Supp. at 224.

Here, because the same factual allegations underlie both the Government's FCA claims and breach of contract claim, the CDA does not deprive this court of subject-matter jurisdiction.

### 2. Unjust enrichment and payment by mistake claims

The Government's complaint alleges that FFS was "unjustly enriched by the receipt of monies to which it was not entitled" "[t]hrough [its] false representations and collusion through its employees performing activities on the M&O contract." (ECF No. 1 at 23.) The complaint also alleges that SRNS and FFS caused the DOE "to make payments in the mistaken belief that payment was due" and, thus, that its payments were by mistake. (*Id.* at 24.) In their motion to dismiss, Defendants argue that these claims should be dismissed, pursuant to Rule 12(b)(6), for failure to state a claim for which the court could grant relief because these claims may not be brought in the face of an express contract that governs the conduct underlying the allegations. (ECF No. 21-1 at 39-40.) In response, the Government argues that dismissal of these equitable claims for the reason advanced by Defendants would be inappropriate because (a) the rules of pleading allow the Government to plead inconsistent theories of liability in the alternative; (b) the Government has the right to sue on common law grounds; and (c) the federal government was permitted to plead similar claims in *Tuomey* and prosecute the claims all the way through trial. (ECF No. 26 at 39-41.)

A plaintiff may not recover on a claim that is quasicontractual in nature in the face of an express contract that governs the matter under dispute. *See Boldt Co. v. Thomason Elec.*, 820 F. Supp. 2d 703, 707 (D.S.C. 2007) ("While parties are permitted under South Carolina law to pursue quasi-contractual claims when there is no valid contract between the parties, or there is some question as to whether the contract is enforceable or applies to the dispute, when the parties agree . . . that a valid and enforceable contract exists which covers the dispute between them, such a claim is superfluous."); *Swanson v. Stratos*, 564 S.E.2d 117 (S.C. 2002) ("If the tasks the plaintiff is seeking compensation for under a quantum meruit theory are encompassed within the terms of an express contract which has not been abandoned or rescinded, the plaintiff may not recover under quantum meruit.") Furthermore, when there is no dispute that an express contract covers the issue and the parties merely disagree regarding the interpretation of the contract, the plaintiff may not maintain the quasicontractual claim even on an alternative basis. *See Boldt*, 820 F. Supp. 2d at 707; *Eldeco, Inc. v. LPS Constr. Co.*, No. 3:08-2295-CMC, 2009 WL 4586003, at *5 (D.S.C. Dec. 1, 2009) (citing *Swanson*, 564 S.E.2d at 120; 66 Am. Jur. 2d *Restitution and Implied Contracts* § 81 (2001)); *see also Gantt v. Morgan*, 18 S.E.2d 672, 673 (S.C. 1942) ("Generally, a plaintiff cannot in an action brought on an express or special contract recover or introduce evidence on an implied contract or quantum meruit."). This rule applies regardless whether the defendant is a party to the contract. *See* 66 Am. Jur. 2d *Restitution and Implied Contracts* § 76 (2010) ("The rule that the presence of an express contract bars recovery under quantum meruit not only applies when a plaintiff is seeking to recover in quantum meruit from the party with whom he or she expressly contracted but also when a plaintiff is seeking to recover from a third party, foreign to the original, that benefited from its performance."); *see also Hilton Worldwide, Inc. Glob. Benefits Admin. Comm. v. Caesars Entm't Corp.*, 532 B.R. 276 (E.D. Va. 2015) (applying New York law).

Here, the Government does not dispute that the M&O contract governs the matter underlying its equitable claims. Indeed, FFS could only have been enriched unjustly and payments to SRNS and FFS could only have been mistaken if the M&O contract provided that the DOE was not required to cover the costs at issue. Nor does the Government provide anything beyond a conclusory statement that the rule described above should not apply to its equitable claims against FFS because the DOE does not have a contract with FFS (*see* ECF No. 26 at 38), and the court rejects this statement. Thus, under the rule so stated, the Government has alleged the existence of an enforceable contract that covers the issues underlying its claims for unjust enrichment and payment by mistake as to both SRNS and FFS, and the Government therefore may not pursue the quasicontractual claims against them.

The arguments that the Government does raise are unpersuasive. The fact that the Federal Rules of Civil Procedure permit a plaintiff to plead alternative, inconsistent theories of liability does not alter the analysis: the undisputed allegation of an enforceable contract that covers the underlying issues forces the court to conclude that these two counts of the complaint fail to state a claim for which relief could be granted. *See Kellogg Brown & Root Servs.*, 800 F. Supp. 2d at 160 (citing *United States v. Sci. Applications Int'l Corp.*, 555 F. Supp. 2d 40, 59 (D.D.C. 2008); *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 79 (D.D.C. 2003)). The fact that the federal government retains the right to raise common law claims like any other plaintiff, *see United States v. Moffit, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667 (4th Cir. 1996), does not mean that the government is entitled to proceed with common law claims where private plaintiffs would be barred. The fact that the federal government was allowed to proceed with its common law claims in *Tuomey* is irrelevant, as the challenged payments in that case were not alleged to have been disallowed by an enforceable express contract but, instead, were alleged to have been fraudulent

specifically because they were for reimbursement for services rendered pursuant to contractual relationships that violated federal law. *See* 675 F.3d at 398-400. Because the Government's complaint alleges that the M&O contract validly governs the matter underlying its two equitable claims and because the Government presents no persuasive reason not to apply the rule discussed above, those claims must be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants motion to dismiss (ECF No. 21) is **GRANTED IN PART** with respect to the Government's claims for unjust enrichment and payment by mistake and with respect to its request for the court to refer the matter to the CBCA for an advisory opinion, and it is **DENIED IN PART** in all other respects.

The Government's claims for unjust enrichment against FFS (Count V) and for payment by mistake against SRNS and FFS (Count VI) in its complaint (ECF No. 1) are **DISMISSED**.

By separate order and referral, the court will seek an advisory opinion from the CBCA on the matters of contract interpretation discussed in Part IV.A.2, *supra*, and will stay proceedings in this case pending receipt of the advisory opinion. The court specifies that the denial of Defendants' motion to dismiss with respect to the Government's FCA claims regarding HO expenses is **WITHOUT PREJUDICE**, and that the motion may be renewed or refiled upon the court's receipt of the advisory opinion and lifting of the stay.

**IT IS SO ORDERED**.

*J. Michelle Childs*

United States District Court Judge

December 6, 2016
Columbia, South Carolina